IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-11406
_____

MELISSA MIGIS,

Plaintiff-Appellee,
Cross-Appellant,

versus

PEARLE VISION, INC.,

Defendant-Appellant,
Cross-Appellee.

_____

Appeals from the United States District Court for
the Northern District of Texas
_____

March 10, 1998

Before REAVLEY, BARKSDALE and STEWART, Circuit Judges.

REAVLEY, Circuit Judge:

The court below entered a judgment in favor of Melissa Migis on her claim of pregnancy discrimination under Title VII, 42 U.S.C. §§ 2000e *et seq*. Defendant Pearle Vision, Inc. appeals on various grounds, and Migis cross appeals on an item of costs. We reverse the award of attorney's fees, and remand for further proceedings. Otherwise we affirm.

A.    *Liability for Pregnancy Discrimination*

Pearle Vision argues that the trial court erred in denying its motion for judgment and finding that Pearle Vision had discriminated against Migis on the basis of her pregnancy.[1] Title VII prohibits employer discrimination against an individual because of such individual's sex.  42 U.S.C. § 2000e-2(a)(1). The term "because of sex" includes "because of . . . pregnancy, childbirth, or related medical conditions."  *Id*. § 2000e(k).

While Pearle Vision presented a substantial case that Migis's termination was not based on her pregnancy, but instead was part of an ongoing, large-scale reduction in force, we cannot say that the district court's finding of discrimination was clearly erroneous.  The evidence in support of that finding includes the following.

Migis was a programmer/analyst in the corporate systems group of Pearle Vision's information services department.  For

---

[1]  By agreement the case was tried to a United States magistrate judge under 28 U.S.C. § 636(c).  Upon the entry of judgment by the magistrate, the parties were entitled to appeal the judgment to this court "in the same manner as an appeal from any other judgment of a district court."  *Id*. § 636(c)(3).  The district court's findings in this Title VII case are subject to the clearly erroneous standard of review. *EEOC v. Clear Lake Dodge*, 60 F.3d 1146, 1151 (5th Cir. 1995).  "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948).  "Where the court's finding is based on its decision to credit the testimony of one witness over that of another, 'that finding, if not internally inconsistent, can virtually never be clear error.'" *Schlesinger v. Herzog*, 2 F.3d 135, 139 (5th Cir. 1993) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985)).

three years she received positive employee evaluations, indicating that her work was fully satisfactory though not exceptional. Migis learned that she was pregnant in January of 1994. She told her immediate supervisor, Mark McQuay, but asked that McQuay keep the knowledge of her pregnancy to himself. Migis was concerned "because of all the women that were being let go and all the discrimination which was taking place at the time." She also wanted to wait until Mike Maher, a vice president, was transferred back to the United Kingdom in March, because she considered Maher a sexist. Management became aware of Migis's pregnancy in March or April.

Due to pregnancy complications related to her diabetes and on the advice of her physician, Migis began working half days, and on April 6 went on temporary disability. She intended to return to work, and so informed McQuay.

McQuay reported to Glenn Graves, the director of information services, who in turn reported to Colin Heggie, a senior vice president. In February management began discussions of a staff reduction in the corporate services group. McQuay testified that management decided to terminate Randy Ragsdale, a senior programmer/analyst, and Tracy Culpepper, a programmer/analyst. Confidential memoranda from Graves to Heggie also reflect this decision. McQuay testified that he had recommended that Migis be retained because of her performance, and that there was no reason she could not be promoted to senior programmer/analyst.

3

Kelly Keahon, the head of the human resources department, advised Graves to clearly state and document for Heggie the anticipated personnel actions. While Graves testified that management had decided to eliminate three positions in the corporate systems group, his memos reflect that only two positions, held by Ragsdale and Culpepper, were to be eliminated. In addition, an organizational chart has handwritten notes by Graves indicating that staffing in the corporate systems group was to be reduced by one senior programmer/analyst and one programmer/analyst. Graves did not tell McQuay that Migis, in addition to Ragsdale and Culpepper, was slated for termination.

McQuay testified that Graves drew a distinction between maternity leave and disability leave, and was of the view that Migis had taken the latter. McQuay stated that Graves was "excited" that Migis was on disability leave because he thought Pearle Vision had greater latitude to eliminate the job if the latter type of leave was taken. Graves denied making such a statement, but the magistrate judge found McQuay's testimony more credible on this point.

Migis gave birth in September, and on October 4 Migis met with Graves regarding her return to work. She was told that her position had been eliminated. The magistrate judge found that a senior programmer position in the corporate systems group was retained, and that a new position for a senior programmer in that group was created. The court credited McQuay's testimony that Migis was qualified for a senior programmer position.

4

Graves told Migis that there was an opening for a programmer in the product support group of the information services department. This position went to Susan Marshall, who was not pregnant and had worked for Pearle Vision as a contract employee since September. Graves testified that members of the product support group were opposed to bringing Migis into their group because of her work ethic and judgment. He stated that he and the head of the product support group did not "attempt to determine [Migis's] qualifications in relationship to the qualifications or in comparison to the qualifications of Susan Marshall."

Given this and other evidence, the magistrate judge concluded that Pearle Vision's proffered reasons for eliminating Migis's job were pretextual, and that Pearle Vision had discriminated against Migis on the basis of her pregnancy when it terminated her. While Pearle Vision offered evidence to the contrary, including plausible explanations for the documents discussed above, we are not persuaded that the district court clearly erred in finding a Title VII violation.

B. *Back Pay Damages*

Pearle Vision challenges the back pay awarded to Migis. Migis was formally notified of her termination on November 7, 1994, when she received a separation agreement which she refused to sign. Her compensation from Pearle Vision ceased on November 25. She received an offer of employment from another company on December 19, but did not begin employment there until January 23,

5

1995. The court awarded back pay for the period between November 25 and January 23.

Pearle Vision argues that the back pay should only cover the period from November 25 to December 19, the date of Migis's new job offer. A Title VII plaintiff has a duty to mitigate her damages by using reasonable diligence to obtain substantially equivalent employment. *Sellers v. Delgado College*, 902 F.2d 1189, 1193 (5th Cir. 1990). Whether the plaintiff has engaged in such an effort is a question of fact subject to review for clear error, and the burden is on the employer to prove failure to mitigate. *Id.*

Migis testified that her new employer told her she could start two weeks after the December 19 offer. However, she explained that she canceled her day care after she lost her job at Pearle Vision. She described finding new day care as "a very strenuous process" and stated that she went to work immediately once she arranged for the care of her daughter. The district court did not clearly err in finding that Migis could not secure suitable child care until January 23, and had accordingly used reasonable diligence in mitigating her damages.

C.  *Compensatory Damages*

Pearle Vision also challenges the district court's award of $5000 in compensatory damages. Where, as here, the employer has more than 500 employees, Title VII claimants may recover compensatory damages of up to $300,000. 42 U.S.C. §§ 1981a(a)(1) & (b)(3)(D). The statute describes such compensatory damages as

6

including damages for "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." *Id*. § 1981a(b)(3).

Our review of mental anguish damages is for abuse of discretion. *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 940 (5th Cir. 1996), *cert. denied*, 117 S. Ct. 767 (1997). In *Patterson*, we reversed awards of mental anguish damages granted to two plaintiffs suing under Title VII and 42 U.S.C. § 1981. We held that awards under the two statutes are governed by the same rules, and that mental anguish damages cannot be recovered absent "some specific discernable injury to the claimant's emotional state." *Id*. In *Patterson*, one of the plaintiffs, Patterson, testified that her firing "emotionally scarred her and resulted in unemployment for almost one year." *Id*. Noting the lack of medical evidence or corroborating testimony, we held that Patterson had not offered sufficient competent evidence to support the award of mental anguish damages, since "[n]o evidence suggests that Patterson was humiliated or subjected to any kind of hostile work environment." *Id*. at 941. The second plaintiff, Brown, suing for racial discrimination, testified that the work environment was "unbearable" and was "tearing my self-esteem down," that he was subjected to racial epithets, and that he felt "frustrated" and "real bad" at being judged for the color of his skin. *Id*. at 939. Noting the lack or corroborating testimony or medical evidence, we found the evidence insufficient to sustain an award for emotional damages, since "[n]o evidence suggests

7

that Brown suffered from sleeplessness, anxiety or depression."
*Id*. at 939.  The court further noted that immediately after his
constructive discharge Brown obtained new employment at a higher
wage.  *Id*. at 939-40.

*Patterson* did not hold that medical evidence or
corroborating testimony is always required for an award of mental
anguish damages.  Instead we stated that some other circuits
"have recognized that a claimant's testimony alone *may* not be
sufficient to support anything more than a nominal damage award,"
and that *Carey v. Piphus*, 435 U.S. 247 (1978), "requires a degree
of specificity which *may* include corroborating testimony or
medical or psychological evidence in support of the [mental
anguish] damage award."  *Id*. at 938, 940 (emphasis added).

*Patterson* also quoted at length an EEOC policy statement
which recognizes that emotional harm may manifest itself "as
sleeplessness, anxiety, stress, depression, marital strain,
humiliation, emotional distress, loss of self esteem, excessive
fatigue, or a nervous breakdown."  *Id*. at 939 (quoting EEOC Policy
Guidance No. 915.002 § II(A)(2), at 10-12 (July 14, 1992)).

In *Farpella-Crosby v. Horizon Health Care Corp.*, 97 F.3d 803
(5th Cir. 1996), the plaintiff prevailed on a Title VII hostile
work environment claim.  We upheld an award of compensatory
damages.  The plaintiff testified that she felt "very
embarrassed, very belittled," "very disgusted," "hopeless,"
"about two inches high," and "started to feel pretty stupid," as
a result of a superior's harassment.  *Id*. at 809.  She stated

8

that the work environment was "very stressful" and that she was "embarrassed every time [she] went in there." A friend testified that she and plaintiff began to go everywhere together, believing that there was "safety in numbers." *Id*. Discussing and distinguishing *Patterson*, we held this evidence sufficient to support an award of compensatory damages, since the jury could conclude that plaintiff "suffered emotional harm that manifested itself as humiliation and stress." *Id*.

The evidence of mental anguish testimony in the pending case consisted solely of Migis's testimony. She testified that her termination, which came without warning, was "a major inconvenience," and that she suffered low self-esteem "not only from not having worked but from getting terminated and not offered a position that I thought I was qualified for . . . ." With her new baby she suffered financial hardships. She stated that she suffered "almost what I would call stress attacks or anxiety attacks," marital hardship, and "major stress," as well as "lot[s] of crying, sleeplessness."

"Judgments regarding noneconomic damages are notoriously variable." *Forsyth v. City of Dallas*, 91 F.3d 769, 774 (5th Cir. 1996), *cert. denied*, 118 S. Ct. 64 (1997). We conclude that the award of compensatory damages was within the court's discretion. As explained above, *Patterson* recognizes that mental anguish damages may be appropriate where the plaintiff suffers sleeplessness, anxiety, stress, marital problems, and humiliation, and does not always require that the plaintiff offer

9

medical evidence or corroborating testimony in addition to her own testimony. *Farpella-Crosby*, too, accepts that stress and humiliation can support an award of mental anguish damages. Migis's testimony of anxiety, sleeplessness, stress, marital hardship and loss of self-esteem was sufficiently detailed to preclude us from holding that the district court abused its discretion in its award of compensatory damages.

D.   *Attorney's Fees*

Pearle Vision challenges the district court's award of approximately $81,000 in attorney's fees to Migis. Migis had requested approximately $110,000 in fees. Under Title VII the court "may allow the prevailing party . . . a reasonable attorney's fee . . . ." 42 U.S.C. § 2000e-5(k).

The calculation of attorney's fees involves a well-established process. First, the court calculates a "lodestar" fee by multiplying the reasonable number of hours expended on the case by the reasonable hourly rates for the participating lawyers. *Louisiana Power & Light Co. v. Kellstrom,* 50 F.3d 319, 324 (5th Cir. 1995). The court then considers whether the lodestar figure should be adjusted upward or downward depending on the circumstances of the case. *Id*. In making a lodestar adjustment the court should look to twelve factors, known as the *Johnson* factors, after *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). The factors are: (1) the time and labor required for the litigation; (2) the novelty and difficulty of the questions presented; (3) the skill required to perform the

10

legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the result obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id*. at 717-719.

We review the district court's initial determination of reasonable hours and reasonable rates for clear error, and its application of the *Johnson* factors for abuse of discretion. *Louisiana Power & Light*, 50 F.3d at 324, 329. Some of these factors are subsumed in the initial lodestar calculation and should not be double counted. *Shipes v. Trinity Indus. Corp.*, 987 F.2d 311, 320 (5th Cir. 1993).

We have explained that, of the *Johnson* factors, the court should give special heed to the time and labor involved, the customary fee, the amount involved and the result obtained, and the experience, reputation and ability of counsel. *Von Clark v. Butler*, 916 F.2d 255, 258 (5th Cir. 1990). The Supreme Court has twice made clear that "the most critical factor" in determining the reasonableness of a fee award in a civil rights suit "is the degree of success obtained." *Farrar v. Hobby*, 506 U.S. 103, 114 (1992) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)).

The magistrate judge recognized the above procedure, and entered a careful and thorough order analyzing Migis's fee request and Pearle Vision's objections.[2] The court noted that the suit was hotly contested and that Pearle Vision amassed over $200,000 in attorney's fees.[3] The court reduced the lodestar amount it calculated by ten percent based on the results obtained.[4] Nevertheless, we conclude that the court did not give adequate consideration to the eighth *Johnson* factor, the amount involved and the result obtained.

By any fair measure, Migis's success relative to the relief she sought was limited. She proceeded to trial on the dual claims that Pearle Vision discriminated against her in terminating her position and in failing to hire her for the opening in the product support group. The district court only found discrimination as to the termination. Further, her complaint alleged four acts of discrimination against Migis "on account of her sex and/or pregnancy," including her discharge, Pearle Vision's failure to allow her to return to work, discrimination in the terms, conditions, and privileges of her employment, and retaliation. Migis prevailed only on the first theory, and only on the basis of pregnancy discrimination. As indicated in interrogatory answers, she sought recovery of back

---

[2] *Migis v. Pearle Vision, Inc.*, 944 F. Supp. 508 (N.D. Tex. 1996).

[3] *Id*. at 514.

[4] *Id*. at 516.

12

pay and benefits of $25,000, and punitive and compensatory damages of $300,000.[5]  At trial she asked for $50,000 in compensatory damages.  The court awarded her only $7,233.32 in back pay, $5000 in compensatory damages, and no punitive damages.[6]

Migis argues that in addition to the award of damages, "[s]he received, importantly, a finding and declaration by the court that she had been discriminated against on the basis of pregnancy."  The judgment indeed declares that Pearle Vision discriminated against her.  However, the Supreme Court has held that such a declaration does not alter the rule that the plaintiff's monetary success in a private civil rights suit must be the primary determinant of the attorney's fee.  "Where recovery of private damages is the purpose of . . . civil rights litigation, a district court, in fixing fees, is obligated to give primary consideration to the amount of damages awarded as compared to the amount sought."  *Farrar*, 506 U.S. at 114 (quoting *City of Riverside v. Rivera*, 477 U.S. 561, 585 (1986) (Powell, J., concurring)).  Migis also argues that this is not a case where the plaintiff's suit can be segregated into discrete

_____

[5]  Although Migis sought $300,000 in compensatory damages and $300,000 in punitive damages, she correctly points out that by statute the sum of these two cannot exceed $300,000. 42 U.S.C. § 1981a(b)(3)(D).

[6]  The court also awarded prejudgment interest of $1058.17 and post-judgment interest at a specified rate, but we see no relevance to these awards.  The award of interest is automatic and bears no relation to the effort or skill of the attorneys or any other *Johnson* factor.  It merely adjusts the damage award to reflect the time value of money.

13

claims, because all of her contentions involved a common core of facts, and because she only prosecuted a single, discrete claim of pregnancy discrimination. Even if Migis's characterization is correct, where "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith." *Hensley*, 461 U.S. at 436.

The attorney's fee award was over six and one-half times the amount of damages awarded. Migis sought over twenty-six times the damages actually awarded. Regardless of the effort and ability of her lawyers, we conclude that these ratios are simply too large to allow the fee award to stand. We hold that the district court abused its discretion by failing to give adequate consideration to the result obtained relative to the fee award, and the result obtained relative to the result sought. We therefore reverse the award of attorney's fees and remand the case for a new determination of fees consistent with this opinion.

E. *Costs*

Pearle Vision and Migis complain of the district court's award of costs. Migis requested costs of $6400.64. The district court awarded costs of $4297.32. It disallowed the witness and process fees for certain witnesses, the cost of plaintiff's

14

videotaped deposition, and costs associated with computerized legal research, couriers, postage and copying.

The district court has broad discretion in taxing costs, and we will reverse only upon a clear showing of abuse of discretion. *Alberti v. Klevenhagen*, 46 F.3d 1347, 1358 (5th Cir. 1995). The trial court "has wide discretion with regard to the costs in a case and may order each party to bear his own costs." *Hall v. State Farm Fire & Cas. Co.*, 937 F.2d 210, 216 (5th Cir. 1991).

Pearle Vision argues that the district court should have disallowed Migis's costs associated with pursuing her unsuccessful claim that Pearle Vision discriminated against her in failing to offer her a new position. The district court disallowed a substantial portion of the costs Migis requested. Even assuming that it is feasible to segregate costs by the two claims Migis prosecuted, Pearle Vision's refusal to rehire her in a new position was arguably of evidentiary value to the claim on which she did prevail--discrimination in her termination--even if the refusal to rehire her was not itself found to be a separate Title VII violation. We cannot say that the court abused its discretion in awarding the costs that it did.

Migis complains that the court erred in denying her the cost of her videotaped deposition. The deposition was transcribed by a court reporter and videotaped. Pearle Vision provided Migis a copy of the transcript. Migis requested and paid for a copy of the videotape. As to deposition fees, 28 U.S.C. § 1920(2) only allows for the recovery of "[f]ees of the court reporter for all

15

or any part of the stenographic transcript necessarily obtained for use in the case." There is no provision for videotapes of depositions. Even if the statute can be interpreted to include such copies, Migis does not show that the videotape of her own deposition, in addition to the transcript, was "necessarily obtained for use in the case." We see no abuse of discretion in denying this cost.

For the foregoing reasons, the district court's award of attorney's fees is reversed, and the case is remanded for a redetermination of attorney's fees. In all other respects the judgment is affirmed.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

*MIGIS V. PEARLE VISION, INC.,* NO. 96-11406


RHESA HAWKINS BARKSDALE, Circuit Judge, concurring in part and dissenting in part:


**Let us consider the reason of the case. For nothing is law that is not reason.**

*Sir John Powell, Lord Raymond's Reports* (1765) vol. 2, p. 911.


In truth, the issues in this case are quite unextraordinary; the majority has disposed of them most efficiently. On the surface, for a case of this type, this is as it should be. This

- 16 -

is especially true for the attorney's fee question, which, as is well-established, should not result in a second litigation and take more time and effort (*and paper*) than the litigation on the merits. So, on the surface, all is well.

But, lurking beneath this placid surface is an ever-expanding, ever-growing, ever-devouring two-headed monster: over-reaching Title VII litigation and concomitant fee awards. Here, out of a plethora of claims, Migis succeeded on only one, recovering little more than the rejected pre-trial settlement offer. And, to add insult to injury, her award is dwarfed by the fee awarded her attorney. As the majority notes, "Migis sought over twenty-six times the damages actually awarded" and her "attorney's fee award was over six and one-half times the amount of damages awarded". Maj. Op. at 14. Obviously, something is amiss. *Reason*, and *reasonableness*, have been lost in the shuffle.

In sum, a person terminated in violation of Title VII, but who found other work almost immediately at a higher compensation, received only approximately $7,200 in back pay and benefits and only $5,000 in compensatory damages (and, in fact, those emotional distress damages should *not* have been awarded), but rejected a $10,000 settlement offer along the way. To top it off, under the Title VII fee-shifting provisions, her lawyer was awarded $81,000! A fee of $81,000, when damages total only approximately $12,000 and when a settlement offer of $10,000 is rejected four months before trial is more than sufficient cause for taking a close, close look not only at this case, but also at

the system and procedures behind it.  Where is *reason*?  Where is *reasonableness*?

Certainly, every case is different.  Certainly, Title VII fee-shifting serves a purpose.  And, certainly, different factors prompt different damages and fee awards.  For the latter, the lodestar, with its adjustment procedure, *if applied properly*, should ensure an acceptable result — a fee that, as required by Title VII, is "*reasonable*".  But, I fear that this procedure is being applied in keeping with the times, with the idea that nothing deserves something, and, especially in that regard, that lawyers must be handsomely rewarded, notwithstanding that their labors bore little, if any, fruit.  This concern is particularly true when rejection of a pre-trial settlement offer almost equal to the total damages is added to the mix.  *Reason* and *reasonableness* are missing in action.

Excess has become an art form.  This case, being a splendid — better yet, sad — example, presents issues that demand far more relief and adjustment than my able panel colleagues are willing to accord.  Therefore, I must respectfully dissent and hope that this alarm, sounded at considerable, but necessary, length, will reach some ears and, perhaps, help restore reason to the damages and fees awarded in cases of this type.  *Reason* can be restored. *Reasonableness* can be achieved.

On the issues, I concur as to liability, back pay, and denial of the cost of a copy of Migis' deposition videotape. But, because the evidence and our precedent do not support an

award of more than nominal compensatory damages for emotional distress, I dissent from affirming the $5,000 compensatory damages award.  And, although I concur in reversing the attorney's fee award and remanding for further proceedings, I cannot agree either with the refusal to require reduction of the lodestar for time spent on unsuccessful claims and in pursuit of irrelevant evidence, or with awarding costs connected with that pursuit.

To assist with focusing on my disagreement and concerns, a restatement of the factual and procedural history is required.

I.

Pearle employed Migis in January 1991 as a Programmer/Analyst in the Corporate Systems Group, part of the Information Services Department, at Pearle's headquarters in Dallas, Texas. In early 1994, Migis' diabetic condition complicated her pregnancy; on the advice of her physician, she began working half-days in late March.  In early April, her physician certified that Migis was unable to work due to her physical condition; shortly thereafter, she requested, and was granted, a leave of absence.

Migis gave birth to her child on 8 September.  Two weeks later, her doctor authorized her to return to work on 7 November. In early October, Migis met with Glenn Graves, director of Migis' department, who informed her that her position had been eliminated, but that he would ascertain whether she would be qualified for a position in the Product Support Group of the same

department. However, Migis was not offered that position; her employment with Pearle ceased effective 11 November 1994.

At the time her position was eliminated, Migis' annual salary was $40,000. On 19 December, just shy of six weeks after her employment ended with Pearle, Migis accepted employment with CompuCom; but, she did not begin work there until approximately a month later, 23 January 1995. At CompuCom, Migis held the position of programmer/analyst, at a higher annual salary ($43,840), plus a five percent pay-on-performance bonus. (About a year after she began, her annual salary increased approximately $4,000, to $47,800, plus retaining the five percent pay-on-performance bonus.) In February 1995, less than a month after beginning at CompuCom, Migis filed this action against Pearle, claiming that it discriminated and/or retaliated against her on account of her sex and/or pregnancy by discharging her; failing to allow her to return to work; discriminating against her in the terms, conditions, and privileges of her employment; and retaliating against her. She sought to have Pearle permanently enjoined from discriminating against her in violation of Title VII; a declaratory judgment that its practices were in violation of Title VII; reinstatement, back pay, and/or front pay; compensatory and exemplary damages; attorney's fees; costs; and pre — and post — judgment interest. The parties consented to trial before a magistrate judge.

At her three-day bench trial in June 1996, Migis dropped her claims for reinstatement and front pay. The magistrate judge

ruled that Pearle violated Title VII when it eliminated Migis'
position in the Corporate Systems Group; but, that she failed to
prove discrimination in connection with Pearle's subsequent
decision not to hire her for the position in the Product Support
Group.  (*Migis does not challenge the latter ruling*.)

Migis was granted declaratory relief and awarded $7,233.32
in back pay and benefits, $5,000 in compensatory damages, and
$1,058.17 for prejudgment interest.  The court declined to award
punitive damages.  And, following a separate hearing on Migis'
request for approximately $110,000 in attorney's fees and $6,400
in costs, she was awarded approximately $81,000 and $4,300,
respectively.  ***Migis v. Pearle Vision, Inc.***, 944 F. Supp. 508,
517-18 (N.D. Tex. 1996).

## II.

### A.

According to Pearle, the evidence demonstrates that Migis'
position, along with all other Programmer/Analyst positions in
the Corporate Systems Group, was eliminated as part of a
reduction in force.  Notwithstanding my concurrence on liability,
recitation of the facts bearing on liability is necessary to
explain the basis of my disagreement on the compensatory damages,
attorney's fee, and cost issues.

Needless to say, the magistrate judge's finding of a Title
VII violation is reviewed under the clearly erroneous standard.
FED. R. CIV. P. 52(a); *see **E.E.O.C. v. Clear Lake Dodge***, 60 F.3d
1146, 1151 (5th Cir. 1995).  And, it is more than well-

- 21 -

established that "a finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *Id*. (quoting *Cupit v. McClanahan Contractors*, 1 F.3d 346, 348 (5th Cir. 1993), *cert. denied*, 510 U.S. 1113 (1994)). "We are not permitted to re-weigh the evidence on appeal simply because we disagree with the choices made by the district court." *Id.* (citing *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573-74 (1985)). "But we will overturn the district court where there is only one permissible view of the weight of the evidence." *Id*.

The record supports the finding that Migis' pregnancy was a substantial factor in eliminating her position. For example, after Migis went on leave of absence in April, memoranda dated 24 May and 22 July from Graves, director of the Information Services Department, to Colin Heggie, chief financial officer, state that two positions would be eliminated from the Corporate Systems Group; and that the targeted positions were a Senior Programmer/Analyst position held by Randy Ragsdale and a Programmer/Analyst position held by Tracy Culpepper, both males. *The memoranda do not mention Migis or her position*. Graves testified that it was decided in late April or early May 1994 that all three positions, including Migis', would be eliminated, and that Migis' position was not addressed because she was on leave at the time and it was Pearle's policy not to address position eliminations affecting on-leave employees. The

magistrate judge found that Graves' testimony might explain why Migis was not told that her job was being eliminated, *but* it did not explain why Heggie was not fully informed of the reductions in the Corporate Systems Group.

The magistrate judge relied also on the testimony of Kelly Keahon, vice president of human resources at the time of the staff reductions. Keahon testified that she told Graves to document carefully his actions and to communicate with Heggie regarding the staff reductions; and that she informed Graves that it was not necessary to include the elimination of Migis' position in the memoranda because that elimination did not have any financial consequences to Pearle during fiscal year 1994. But, when Graves was asked by the court to explain why the memoranda contain no reference to the elimination of Migis' position, he responded that he should have addressed it. Keahon, however, testified that, if Graves said that the reason he did not refer to Migis in the memoranda was because he made a mistake, that would be inconsistent with what she told him.

The magistrate judge also relied on handwritten notations on the bottom of an organizational chart, made by Graves at one of the initial meetings when the staff reductions were discussed. The notations refer to one Senior Programmer/Analyst and one Programmer/Analyst. Graves testified that the notations indicate that there were preliminary discussions about *retaining* one Senior Programmer/Analyst and one Programmer/Analyst. But, the magistrate judge found that "the weight of the credible evidence"

led him to conclude that the notations refer to the positions that were instead targeted for *elimination*, as indicated in the memoranda.

The magistrate judge found further that Pearle's explanation was also undermined by the testimony of Mark McQuay, manager of the Corporate Systems Group and Migis' *supervisor* beginning in early 1994. McQuay testified that Migis was not targeted for elimination in the downsizing effort; that he recommended retaining her; but that Graves was excited that Migis had taken disability, instead of maternity, leave because Graves thought (erroneously) that there was a distinction, and that he would not have been able to eliminate her position had she taken maternity leave. Graves denied making such a statement.

Pearle exhaustively attacks the findings, contending, *inter alia*, that the magistrate judge misinterpreted Graves' notations on the organizational chart and mischaracterized McQuay's testimony. It asserts also that the magistrate judge ignored other evidence, including: that all organizational charts created after May 1994 consistently reflect the elimination of *all* Programmer/Analyst positions in the Corporate Systems Group, including the one formerly held by Migis; the handwritten notation "upon return" beside Migis' name on the organizational chart, which, according to Pearle, corroborates Graves' testimony that Ragsdale and Culpepper's positions were to be eliminated as soon as possible, but that Migis' position would be eliminated "upon return" from her leave; and McQuay's testimony regarding

his dissatisfaction with Migis' performance. Pearle contends further that the magistrate judge erred by relying on McQuay's testimony regarding Graves' alleged statement about the nature of Migis' leave, because McQuay's testimony is so internally inconsistent and contradictory that no reasonable person would believe it.

*Pearle's contentions are not without substance;* it presented considerable plausible evidence that the elimination of Migis' position was part of a massive reduction in force.  But, there is also substantial, plausible evidence to support the magistrate judge's finding that Pearle's explanation was, instead, a pretext for discrimination.  It goes without saying that credibility determinations are "peculiarly within the province of the district court" when it sits as a trier of fact.  **Kendall v. Block**, 821 F.2d 1142, 1146 (5th Cir. 1987); *see also* **Patterson v. P.H.P. Healthcare Corp.,** 90 F.3d 927, 933 (5th Cir. 1996) (internal quotation marks and citations omitted) ("Where the court's finding is based on its decision to credit the testimony of one witness over that of another, that finding, if not internally inconsistent, can virtually never be clear error."), *cert. denied*, ___ U.S. ___, 117 S. Ct. 767 (1997).  We will declare testimony incredible as a matter of law only when it "is so unbelievable on its face that it defies physical laws". **United States v. Casteneda**, 951 F.2d 44, 48 (5th Cir. 1992) (internal quotation marks and citation omitted). Contrary to

Pearle's assertion, McQuay's testimony does not come close to meeting that standard.

In sum, because the magistrate judge's "account of the evidence is plausible in light of the record viewed in its entirety, [we] may not reverse it even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently.  Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  *Anderson*, 470 U.S. at 573-74.

B.

Pearle challenges the damages on two grounds:  back pay for the one-month period between Migis' accepting the CompuCom offer and beginning work; and compensatory damages of $5,000.  Although I agree that the back pay award is not clearly erroneous, I respectfully dissent from affirming the compensatory damages; under our precedent, Migis failed to prove that she is entitled to more than nominal damages for emotional distress.

Under Title VII, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981a(a)(1), "a Title VII plaintiff who wins a back pay award may also seek compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses."  *Landgraf v. USI Film Products*, 511 U.S. 244, 253 (1994) (internal quotation marks and citation omitted).  In awarding the compensatory damages, the district court did not make supporting findings.  Pearle maintains that the award should be reversed

because Migis did not present any economic, medical, or psychological evidence to support the award.

In **Carey v. Piphus**, 435 U.S. 247, 255-56 (1978), the Court held that compensatory damages such as for emotional harm caused by the deprivation of constitutional rights may be awarded only when the claimant submits proof of actual injury. Although **Carey** refers to damage awards under 42 U.S.C. § 1983, its reasoning applies to claims for emotional harm under 42 U.S.C. § 1981. **Patterson**, 90 F.3d at 938 & n.11. And, the same standards apply for Title VII emotional distress claims. **Id**. at 940.

Under **Carey**, a claimant must present testimony and/or other evidence to show the nature and extent of emotional harm *caused by the alleged violation*. **Patterson**, 90 F.3d at 938. **Carey** stated:

> We use the term "distress" to include mental suffering or emotional anguish. Although essentially subjective, genuine injury in this respect may be evidenced by one's conduct and observed by others.... [A]n award of damages must be supported by competent evidence concerning the injury.

435 U.S. at 264 n.20. "In order to establish intangible loss, we recognize that **Carey** requires a degree of specificity which may include corroborating testimony or medical or psychological evidence in support of the damage award." **Patterson**, 90 F.3d at 940. "Hurt feelings, anger and frustration are part of life. Unless the cause of action manifests some specific discernable injury to the claimant's emotional state, we cannot say that the specificity requirement of **Carey** has been satisfied." **Id**.

- 27 -

The 1991 amendments allowing compensatory damages under Title VII have been interpreted by the EEOC to require physical manifestations in order to recover for emotional harm:

> Damages are available for the intangible injuries of emotional harm such as emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life. Other nonpecuniary losses could include injury to professional standing, injury to character and reputation, injury to credit standing, loss of health, and any other nonpecuniary losses that *are incurred as a result of the discriminatory conduct*. Nonpecuniary losses for emotional harm are more difficult to prove than pecuniary losses. *Emotional harm will not be presumed simply because the complaining party is a victim of discrimination. The existence, nature, and severity of emotional harm must be proved*. Emotional harm may manifest itself, for example, as sleeplessness, anxiety, stress, depression, marital strain, humiliation, emotional distress, loss of self esteem, excessive fatigue, or a nervous breakdown. Physical manifestations of emotional harm may consist of ulcers, gastrointestinal disorders, hair loss, or headaches.... The Commission will typically require medical evidence of emotional harm to seek damages for such harm in conciliation negotiations.

*Patterson*, 90 F.3d at 939 (quoting EEOC POLICY GUIDANCE NO. 915.002 § II(A)(2), at 10-12) (first emphasis added; second emphasis in original). "Our standard of review for awards based on intangible harms such as mental anguish is deferential to the fact finder because the harm is subjective and evaluating it depends considerably on the demeanor of witnesses." *Id*. at 937-38 (internal quotation marks and citations omitted). "We ... review the district court's emotional damage award for abuse of discretion." *Id*. at 940.

- 28 -

The **Patterson** case, discussed by the majority, is instructive in evaluating Migis' compensatory damage award. In **Patterson**, the district court awarded Brown $40,000 for emotional distress under § 1981 and awarded Patterson $150,000 for emotional damage, mental pain and suffering under Title VII. **Id**. at 939, 940. The evidence submitted by Brown in support of his claim for emotional harm under § 1981 consisted of the following: he testified that he felt "frustrated" and "real bad" for being judged by the color of his skin; explained that the work environment was "unbearable" and was "tearing my self-esteem down"; and "stated that it 'hurt' and made him 'angry' and 'paranoid' to know that his supervisor referred to [him] as a 'porch monkey' or a 'nigger' and generally thought that he was inferior to white employees." **Id**. at 939.

Our court held that this evidence was insufficient to support anything more than a *nominal* damage award, because Brown did not present evidence with the specificity required by **Carey**, did not testify as to any manifestations of harm listed by the EEOC policy statement, and presented no corroborating testimony or expert medical or psychological evidence of damages caused by his alleged distress; no evidence suggested that Brown suffered from sleeplessness, anxiety, or depression; and, immediately after his constructive discharge, he obtained other employment for a higher wage. **Patterson**, 90 F.3d at 939-40.

As noted, Patterson sued the same employer as did Brown. Patterson's emotional harm award was based on her testimony that

her retaliatory firing emotionally scarred her, that she suffered mental anguish during her unemployment, and that she endured a great deal of familial discord arising from having to leave her children while she worked in other areas. *Id*. at 940. Our court stated: "Obviously, the retaliatory discharge caused a substantial disruption in Patterson's daily routine." *Id*. at 941. But, we concluded, again, that the evidence would not permit anything more than *nominal* damages. *Id*. We noted, again, that the record contained none of the listed evidentiary factors in the EEOC policy statement; no corroborating testimony was offered to support Patterson's testimony; no evidence suggested that she was humiliated or subjected to any kind of hostile work environment; there was no expert medical or psychological evidence to support a claim for emotional harm; and there was no proof of actual injury. *Id*.

Migis testified that the elimination of her position was a major inconvenience and burden because of financial obligations; that she suffered from low self-esteem as a result of being terminated and not offered a position for which she felt qualified, and because she had been out of the work arena for several months; that it was "a very discomforting feeling"; that not being allowed to work impacted family finances and that she had to buy used furniture for her child; that she suffered from "general anxiety, stress or anxiety attacks"; that it "caused some hardship on my marriage"; that it was "major stress", and a

"[l]ot of crying, sleeplessness"; and that wondering whether she could afford diapers and formula "was not fun".

The majority acknowledges that the evidence of mental anguish consists *solely* of Migis' testimony, but concludes that her testimony of anxiety, sleeplessness, stress, marital hardship, and loss of self-esteem was sufficiently detailed to support $5,000 for mental anguish. Even assuming that the majority correctly interprets **Patterson** as not *requiring* medical evidence or corroborating testimony, I cannot agree that Migis' testimony supports more than a nominal damages award.

First, **Patterson** and the EEOC policy statement require proof of a causal relationship between the discriminatory conduct and the emotional harm. *See* **Patterson**, 90 F.3d at 938; *id.* at 939 (quoting EEOC policy statement). Unlike the plaintiff in **Farpella-Crosby v. Horizon Health Care**, 97 F.3d 803, 808-09 (5th Cir. 1996), who testified that her emotional distress resulted from her superior's harassment, Migis did not testify that the emotional harm she claims to have suffered resulted from illegal discrimination; indeed, one can conclude from her testimony that her emotional suffering would have been the same had her position been eliminated for non-discriminatory reasons. Unfortunately, and understandably, some form of distress is inevitable with job loss. But, for recovery of more than nominal damages for such distress, the law requires proof that it is caused by illegal discrimination, not just the job loss.

Second, pursuant to *Patterson*, Migis' evidence for mental distress lacks the specificity required by *Carey* and is insufficient to support anything more than a nominal damage award.  *See* *Carey*, 435 U.S. at 266-67 (plaintiffs entitled to recover "nominal damages not to exceed one dollar" for denial of procedural due process, without proof of actual injury); *Patterson*, 90 F.3d at 941 (vacating Title VII emotional distress award and remanding to district court with instructions to award nominal damages; amount not specified); *Archie v. Christian*, 812 F.2d 250, 252 (5th Cir. 1987) (modifying judgment to hold plaintiff entitled to receive one dollar in nominal damages); *Davis v. West Community Hospital*, 755 F.2d 455, 459 (5th Cir. 1985) (remanding for entry of judgment for nominal damages of one dollar); *Irby v. Sullivan*, 737 F.2d 1418, 1433 n.30 (5th Cir. 1984) (even if no emotional damages are awarded, plaintiff entitled to nominal damages not to exceed one dollar if he has been victim of intentional racial discrimination).  *See also* *Price v. City of Charlotte*, 93 F.3d 1241, 1246 (4th Cir. 1996) (plaintiff's failure to prove compensatory damages for constitutional violation "results in nominal damages typically one dollar"), *cert. denied*, ___ U.S. ___, 117 S. Ct. 1246 (1997).

Although Migis' testimony mentioned some of the factors in the EEOC policy statement (sleeplessness, anxiety, stress, marital strain, loss of self-esteem), she admitted, on cross-examination, that she had not mentioned *any* of those factors in her pre-trial deposition.  She admitted also that she had not

sought counseling or therapy.  There is no evidence that she was humiliated or subjected to a hostile work environment.  *See Patterson*, 90 F.3d at 941; *see also Bellows v. Amoco Oil Co.*, 118 F.3d 268, 277 n.28 (5th Cir. 1997) (Bellows' testimony that Amoco's alleged discriminatory acts caused him to feel "less than a man" and "ruined his reputation as a man" did not, "without more", sufficiently support an award of damages for emotional harm), *cert. denied*, ___ U.S. ___, 118 S. Ct. 739 (1998); *Annis v. County of Westchester*, ___ F.3d ___, 1998 WL 49317 (2d Cir. 1998) (plaintiff's testimony that she was humiliated by the gender discrimination she endured and sought counseling for it is insufficient to warrant an award of compensatory damages because "[s]he has not alleged any physical manifestations of her emotional distress" and "introduced no affidavit or other evidence to corroborate her testimony"); *cf. Farpella-Crosby*, 97 F.3d at 808-09  (affirming award of $7,500 compensatory damages based on plaintiff's testimony about hostile work environment, harassment, and abusive treatment, corroborated by co-worker's testimony).  She did not present any corroborating testimony and did not offer any expert medical or psychological evidence of damages caused by her claimed distress.  *See Patterson*, 90 F.3d at 939.  Moreover, approximately two months after she was last compensated by Pearle, she resumed work at a *higher salary* than she received at Pearle.  *See id*. at 939-40.

In short, the district court abused its discretion by awarding more than nominal damages to Migis for emotional

distress.  Therefore, I respectfully dissent from the majority's affirming that award.

## C.

In his fee application, Migis' counsel requested approximately $110,000 for 385.25 hours of work performed by attorneys and legal assistants and $6,400 for costs.  *Migis*, 944 F. Supp. at 510.  Over Pearle's objections, approximately $81,000 in fees and $4,300 in costs were awarded.  Pearle challenges both; Migis, one item of disallowed costs.

In line with my concurrence in reversing the attorney's fee award and remanding for further proceedings, I agree that the magistrate judge, when adjusting the lodestar, abused his discretion by failing to adequately consider the results obtained as compared to the relief sought.

However, I disagree with the majority's implicit conclusion that, when calculating the lodestar, the magistrate judge did not clearly err by including hours spent on unsuccessful claims and unnecessary discovery in pursuit of irrelevant evidence. Concomitantly, I dissent from allowing costs for those unsuccessful claims.

Finally, and perhaps most importantly, the majority fails to give sufficient guidance for reconsideration of the lodestar adjustment on remand, particularly with respect to Migis' refusal of the settlement offer and the relevance of the fees charged by Pearle's counsel.  We should offer guidance on both, especially the settlement offer subissue.

These issues inhabit familiar ground.  For many years, that terrain has been thoroughly and painstakingly analyzed, checked, swept, and probed.  But, that does not ensure that new booby traps have not been set while courts were not on guard.  Perhaps, because the ground is so familiar, courts have become less watchful, less demanding, than they should be.  Perhaps, things have become too routine, and courts have grown lax.  Perhaps, courts need to return to the basic course, and re-walk this ground.  In doing so, the district court's errors loom large and fatal.

1.

For starters, it is well to remember than only a *reasonable* fee may be awarded.  There is *that* word again — *reasonableness*. Title VII provides, in pertinent part, that "the court, in its discretion, may allow the prevailing party ... a *reasonable* attorney's fee ... as part of the costs".  42 U.S.C. § 2000e-5(k) (emphasis added).

Pursuant to the well-established, and equally well-known, procedure for satisfying the statutory command that the attorney's fee be *reasonable,* the district court determines, and then multiplies, the number of hours *reasonably* expended on the litigation by the *reasonable* hourly rates for the participating lawyers; it may adjust this "lodestar" in the light of the 12 well-known, relevant case-related factors enunciated in ***Johnson v. Georgia Highway Express, Inc.***, 488 F.2d 714 (5th Cir. 1974). *See **Farrar v. Hobby***, 506 U.S. 103, 114-15 (1992); *e.g.,* ***Louisiana***

- 35 -

*Power & Light Co. v. Kellstrom*, 50 F.3d 319, 323-24 (5th Cir.), *cert. denied*, ___ U.S. ___, 116 S. Ct. 173 (1995).

Admittedly, and as noted, "[a] request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).  Nor do we require the district court's *Johnson* factor analysis "to be so excruciatingly explicit ... that decisions of fee awards consume more paper than did the cases from which they arose".  *Louisiana Power & Light Co.*, 50 F.3d at 331 (internal quotation marks and citation omitted).  On the other hand, when, as here, the fee request is so excessive, especially in the light of the meager results achieved, the request must be given the closest scrutiny.

Hour and rate determinations are reviewed only for clear error, *Louisiana Power & Light Co*., 50 F.3d at 324; lodestar adjustments, for abuse of discretion.  *Id*. at 329.  As for the latter, "the district court's lodestar analysis [is examined] only to determine if the [district] court *sufficiently considered* the appropriate criteria".  *Id*. (emphasis in original).  Of course, the challenger "bears the burden of showing that [a change] is warranted."  *Id*.

As reflected in *Farrar*, 506 U.S. at 115, the *Johnson* factors for the lodestar adjustment *vel non* hardly need repeating: (1) required time and labor; (2) issues' novelty and complexity; (3) skill required to properly litigate them; (4) whether attorney had to refuse other work; (5) his customary fee; (6) whether fee fixed or contingent; (7) whether client or case circumstances

imposed any time constraints; (8) amount involved and results obtained; (9) experience, reputation, and ability of attorneys; (10) whether case was "undesirable"; (11) type of attorney-client relationship and whether it was long-standing; and (12) awards made in similar cases. *Louisiana Power & Light Co*., 50 F.3d at 329 (citing *Johnson*, 488 F.2d at 717-19).

In district court, Pearle objected to both the time and rate amounts, relying on (1) inadequacies in billing records; (2) Migis' failure to prevail on her claim that Pearle's refusal to offer her a position in the Product Support Group was discriminatory; (3) unnecessary work; (4) excessive time charged for completion of routine tasks; and (5) lack of novel or complex legal issues. *Migis*, 944 F. Supp. at 511-12.

The district court rejected Pearle's contention that the billing records were inadequate due both to the vagueness of the description of services rendered and to counsel's failure to segregate the time spent on various claims. It found that Pearle had not identified any specific entries that were duplicative, repetitive, or inherently unreasonable, and concluded that the records were "more than adequate". *Id.* at 512.

The district court acknowledged that Migis' claims were based on two different employment decisions, *id.* at 510; but, it concluded that her claims were related. *Id.* Accordingly, it rejected Pearle's contention that 85.5 hours spent on unsuccessful claims should be excluded. *Id.* It also rejected Pearle's contention that 156.75 hours should be excluded because

they represented unnecessary or excessive time and "clerical" work.  *Id*. at 513.

And, although the district court agreed with Pearle's assertion that the issues were neither novel nor complex, it disagreed that the number of hours invested in the case was *unreasonable*.  *Id*.  It found significant defense counsel's billing Pearle over $200,000.  *Id*. at 514.

The district court refused to award the requested hourly rates of $300 for counsel and $70 for legal assistants, reducing them to $250 for lead counsel, $200 for co-counsel, and $50 for legal assistants.  *Id*. at 514-15.  (*Pearle does not challenge these rates on appeal*.)

The resulting lodestar was approximately $90,000.  But, the district court found that "[t]he monetary damages awarded to [Migis] simply [did] not justify a fee award" in that amount, because it "would constitute the *type of windfall* repeatedly condemned by the Supreme Court and the Fifth Circuit."  *Id*. at 516 (emphasis added).  Therefore, based on the results obtained, it reduced the lodestar — *but, by only ten percent*!  *Id*.

Pearle also sought a reduction based on the contingent nature of Migis' fee.  Her contingent-fee contract provides for a fee of 45% of the amount recovered.  However, it provides also that, if fees are awarded in excess of that 45%, Migis' fee obligation is extinguished and her attorney keeps the fee awarded.

Of course, a contingent-fee arrangement does not automatically limit the fee award, *Blanchard v. Bergeron*, 489 U.S. 87, 92 (1989). Nevertheless, "[t]he presence of a pre-existing fee arrangement may aid in determining *reasonableness* [because] [t]he fee quoted to the client or the percentage of the recovery agreed to is helpful in demonstrating the attorney's fee expectation when he accepted the case." *Id*. at 93 (internal quotation marks and citations omitted; emphasis added). Although the contingent nature of the fee arrangement may be considered in determining whether to *reduce* the lodestar, a lodestar *enhancement* cannot be based on that factor. *City of Burlington v. Dague*, 505 U.S. 557, 567 (1992).

Along that line, the district court refused to adjust downward based on the contingent nature of the fee; nor would it so adjust because of the case's *desirability* (Pearle claimed that, for applying the "undesirability" *Johnson* factor, the case was, in fact, desirable). *Migis*, 944 F. Supp. at 516-17. As a result, the court determined that Migis was entitled to fees of $80,718.75.

I agree with Pearle that the district court clearly erred by awarding fees to Migis as the prevailing party on all issues and abused its discretion by not giving due weight to the most critical *Johnson* factor — the relationship between relief sought and obtained — as required by *Farrar,* 506 U.S. at 114.

a.

*Hensley* states that a "district court ... should [,*inter alia*,] exclude from [the] initial fee calculation [,the lodestar,] hours that were not reasonably expended", and that the prevailing party's counsel "should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission."  461 U.S. at 434 (internal quotation marks omitted). Pearle's attack on the lodestar concerns unsuccessful claims, discovery as to irrelevant evidence, and inadequate billing records.

i.

Citing *Hensley*, the Supreme Court stated in *City of Burlington*, 505 U.S. at 565: "[T]he statutory language limiting fees to prevailing ... parties bars a prevailing plaintiff from recovering fees relating to claims on which he lost". *Hensley* provides that, when a plaintiff succeeds on some, but not all, of her claims, "two questions must be addressed": (1) whether "the plaintiff fail[ed] to prevail on claims that were unrelated to the [successful] claims"; and (2) whether "the plaintiff achiev[ed] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award". *Hensley*, 461 U.S. at 434.

The object of the first question is to determine the successful and unsuccessful claims, and the degree to which such claims are related; as stated, generally, it can and should be

- 41 -

answered in the lodestar calculation prior to any adjustment. *See* *id*. at 434-35 (fees should not be awarded for unrelated unsuccessful claims).  But, if those claims are so interrelated that no distinction can be made as to the time spent on each, "the district court's focus should shift to the results obtained and adjust the lodestar accordingly". *Louisiana Power & Light Co.*, 50 F.3d at 327 n.13.

The second question addresses the degree of success achieved on the successful claims and, generally, is more appropriately considered in determining the lodestar adjustment.  *See* *Hensley*, 461 U.S. at 440 ("[T]he inquiry does not end with a finding that the plaintiff obtained significant relief.  A reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole."); *Farrar*, 506 U.S. at 114 (internal quotation marks and citations omitted) ("if ... plaintiff has achieved only partial or limited success, [the lodestar] may be ... excessive"; "[w]here recovery of private damages is the purpose of ... civil rights litigation, a district court, in fixing fees, is obligated to give primary consideration to the amount of damages awarded as compared to the amount sought").

Obviously, the extent to which successful and unsuccessful claims are related is crucial in determining whether fees may be awarded for work on the latter.  *Hensley* addresses four situations.   First, when a plaintiff presents "distinctly different claims for relief that are based on different facts and

legal theories, ... work on an unsuccessful claim cannot be deemed to have been expended in pursuit of the ultimate result achieved"; accordingly, "no fee may be awarded for services on the unsuccessful claim". *Hensley*, 461 U.S. at 435.

Second, when the claims "involve a common core of facts[,] or [are] based on related legal theories[,] [m]uch of counsel's time will be devoted generally to the litigation as a whole, [and] it [will be] difficult to [separate] the hours expended [on each claim]"; in such cases, "the district court should focus on the significance of the overall relief obtained ... in relation to the hours *reasonably* expended". *Id.* (emphasis added).

Third, when "a plaintiff has obtained excellent results, ... the fee ... should not be reduced simply because the plaintiff failed to prevail on every contention." *Id.*

And, finally, if "a plaintiff has achieved only partial or limited success, the [lodestar] may be ... excessive[,] ... even whe[n] the ... claims were interrelated, nonfrivolous, and raised in good faith." *Id.* at 436.

> Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill. *Again, the most critical factor is the degree of success obtained.*

*Id.* (emphasis added).

As the district court and Migis' opening statement acknowledged, her claims were based on two different employment decisions by Pearle: to eliminate her position; and not to offer her another, 944 F. Supp. at 510. Migis was successful on the

- 43 -

first, but not the second.  Nevertheless, because the district court found that both claims involved common facts or derived from related legal theories, it included in the lodestar all hours spent pursuing both claims.

The majority assumes *arguendo* that Migis is correct in claiming her action cannot be broken into separate claims; and, therefore, it mentions Migis' failure to prevail on her claim of discrimination in Pearle's refusal to offer her a position in the Product Support Group only in its discussion of the lodestar adjustment under the eighth **Johnson** factor (amount involved and result obtained).  (In fact, as noted in its discussion of the cost award, discussed *infra*, the majority apparently considers the refusal to offer another position to have been of some evidentiary value for the position elimination claim.)  In my view, **Hensley** requires that time spent on the unsuccessful claim should be deducted *prior* to calculating the lodestar, rather than when later considering whether to adjust the lodestar based on the degree of success achieved.

The factual circumstances surrounding the decision to eliminate Migis' position in the Corporate Systems Group and the decision not to offer her a position in the Product Support Group were made at different times and by different decision-makers, are easily distinguishable from an evidentiary and preparation standpoint, and are not so interrelated that it would be difficult to distinguish between the work done on each claim.

Concerning her successful claim (position elimination), Migis relied on her testimony and that of Graves, McQuay and Rodriguez, whom she also deposed. She also deposed Gieseking, Schwartz, and Smith; Smith did not testify at trial, and Gieseking's and Schwartz's trial testimony was curtailed because of the court's *exclusion of non-pregnancy-related evidence, discussed below, and evidence regarding persons who were not decision-makers.*

For her unsuccessful claim (not offered another position), Migis relied primarily on her testimony and that of Boswell and Marshall, whom she also deposed. Although Migis subpoenaed Melissa Kinnear, she neither called her as a witness nor deposed her. Graves testified also about this claim; he and Migis were the only witnesses whose testimony was relevant to both claims. As stated, with the exception of Graves and Migis, none of these witnesses offered *any* testimony that contributed to the success of Migis' position elimination claim.

Migis is not entitled to attorney's fees for the hours spent in pursuing this unsuccessful claim; and, therefore, the district court clearly erred in including them in the lodestar.

### ii.

Pearle asserts further that Migis' counsel should not be compensated for *discovery relevant only to general sex (as opposed to pregnancy) discrimination (including general hostility toward gender, and Pearle's managerial attitude toward female and minority employees).* As noted, such evidence was excluded at

trial.  But, the magistrate judge did not exclude time spent on such discovery; and the majority does not address Pearle's contention.

For example, on 25 January 1996, counsel charged 9.25 hours for "preparation for, and deposing, Mark McQuay, Russell Smith, Rosie Rodriguez, and *Carole Schwartz*; review notes of same and dictation."  (Emphasis added.)  And, counsel charged 6.75 hours on 22 February 1996 for preparing for, and deposing, *Doris Gieseking* and Barry Boswell, and review of notes regarding same. It is impossible to tell from these entries how many of those hours were related to *Gieseking and Schwartz*, whose trial testimony was severely curtailed, as noted, after the court refused to allow Migis to elicit testimony from them about sex discrimination unrelated to pregnancy, such as Pearle's attitude toward women generally.

Surely, prior to discovery, Migis' counsel researched the admissibility of such general sex discrimination; it is *not* probative of pregnancy discrimination.  *See **Todd v. Inn Development & Management, Inc.***, 870 F. Supp. 667, 671 n.4 (D.S.C. 1994) (affidavit stating that employer had a consistent pattern of firing female employees and replacing them with male employees fails to address issue of pregnancy discrimination).  *See also* ***Kelly v. Boeing Petroleum Services, Inc.***, 61 F.3d 350, 357-58 (5th Cir. 1995) (derogatory remarks about race, sex, and national origin not probative of discrimination on basis of disability); ***E.E.O.C. v. Ackerman, Hood & McQueen, Inc.***, 956 F.2d 944, 948

(10th Cir.) (inquiry is "whether ... employer treats pregnancy or pregnancy-related conditions differently than other medical conditions"; thus, appropriate "comparison is ... between pregnant and nonpregnant workers, not between men and women"), *cert. denied*, 506 U.S. 817 (1992); **Rauh v. Coyne**, 744 F. Supp. 1181, 1183 (D.D.C. 1990) (evidence of racial animus excluded in case alleging discrimination on basis of sex and marital status).

At trial, each time Migis' counsel sought to introduce evidence of general sex discrimination, the magistrate judge ruled that it was not admissible, absent some case authority that other gender-related evidence was relevant in a pregnancy discrimination case. Although counsel stated that he would provide such authority, it does not appear that he did so. In any event, as noted, the evidence was not admitted. Yet time spent on discovery on this area was included in the lodestar. Where is reason?

Because these tasks did not contribute to the favorable result on the position elimination claim, the hours devoted to them are not compensable. Accordingly, the district court clearly erred by including them in the lodestar. *See* **Hensley**, 461 U.S. at 436.

### iii.

Along this line, Pearle maintains that, in order to enable identification of distinct claims, Migis' counsel's records do not adequately describe and disclose the work, and that the court abused its discretion by not requiring Migis' counsel to provide

more detail.  Again, the majority does not address this contention.  Based on my review of the billing records, I agree that it is difficult to determine the number of hours spent on each claim.  For example, the 9 June 1996 entry is for 10.75 hours for "continued trial preparation, and outline of testimony for plaintiff, Boswell, Graves, Marshall; lengthy conference with client, and case walk-through; t/c with B. Jones re exhibits; research re maternity leave cases".  It is impossible to tell how much of this time involved outlining the testimony of Boswell and Marshall, whose testimony, as noted, was relevant only as to Migis' unsuccessful claim.  Other entries suffer from the same deficiency.    Of course, it is within the district court's sound discretion whether additional detail is necessary in order to accurately determine the number of compensable hours for the lodestar.  However, it is the duty of the party seeking a fee award to submit evidence supporting the time spent and to "maintain billing time records in a manner that will enable a reviewing court to identify distinct claims".  *Hensley*, 461 U.S. at 433, 437.  Where the documentation is inadequate, the district court may reduce the fee accordingly. *Louisiana Power & Light Co.*, 50 F.3d at 324.  *See also* *Von Clark v. Butler*, 916 F.2d 255, 259 (5th Cir. 1990) ("Absent a reliable record of the time expended on the prevailing claim, it is within the discretion of the district court to determine a reasonable number of hours that should have been expended in pursuing the claim on which the party prevailed.").

b.

Concerning the evaluation of the *Johnson* factors in adjusting the lodestar, Pearle claims, and the majority agrees, that the magistrate judge *failed to give proper weight to the most critical factor*: degree of success obtained. *See* **Farrar,** 506 U.S. at 114 (internal quotation marks and citation omitted) (emphasis added) ("the most critical factor in determining the *reasonableness* of a fee award is the degree of success obtained"). As stated, however, further guidance should be provided for reconsideration of the lodestar adjustment on remand. Specifically, the majority addresses neither the relevance of Migis' rejection of the settlement offer nor whether it is appropriate to consider the attorney's fees incurred by Pearle.

In pre-trial disclosures and discovery responses, Migis stated that she sought $25,000 in back pay and $300,000 *each* in compensatory and punitive damages. The 1991 amendments to Title VII provide, however, that the sum of compensatory and punitive damages shall not exceed $300,000. 42 U.S.C. § 1981a(b)(3). In any event, at trial, she sought far less: back pay and benefits; and $50,000 *each* for compensatory damages (humiliation, loss of self-esteem, inconvenience, and anguish) and punitive damages. It hardly bears reminding that she was awarded far, far less than that: only $7,233.32 in back pay and benefits and $5,000 in compensatory damages, and *no* punitive damages. She also sought,

and obtained, a declaratory judgment that Pearle engaged in discriminatory practices.

In that I would hold that Migis is entitled to only nominal compensatory damages, rather than $5,000, this obviously would substantially impact her degree of success. Accordingly, I would hold that, on remand, the district court should reconsider this degree of success factor *after* it re-calculated the lodestar (had my view prevailed, that recalculation would include deducting time spent on unnecessary tasks and on Migis' unsuccessful claim, as discussed *supra*).

But, my view has not prevailed. The majority remands only for reconsideration of the degree of success factor. In that regard, I would offer the following guidance.

Had my view been adopted by the majority, then time spent in pursuit of Migis' unsuccessful claim and on other unnecessary tasks would have been deducted in calculating a new lodestar. Next, the district court, on considering this degree of success factor in adjusting that new (recalculated) lodestar, would have taken into account only the degree of success obtained for the successful claim, avoiding duplication of the considerations used to determine the hours *reasonably* expended when recalculating the lodestar. *See* **Shipes**, 987 F.2d at 320 ("district court must be careful ... not to double count a **Johnson** factor already considered in calculating the lodestar"). The purpose of this inquiry is to determine whether the (new) lodestar should be

adjusted and, if so, how much, in the light of the results obtained in comparison to the relief sought.

But, again, the majority is *not requiring a recalculation* of the lodestar.  Therefore, *in adjusting it* on remand, the district court is not faced with this double-counting problem. Accordingly, on remand, the adjustment *should be even greater* than it would have been had a new, smaller lodestar been calculated.

As was the case in **Farrar**, the outcome of this litigation affects only the parties.  It did not result in a significant legal pronouncement that will benefit society; instead, it "accomplished little beyond giving [Migis] the moral satisfaction of knowing that a federal court concluded that [her] rights had been violated" and compensating her for a relatively short period of unemployment.  *See* **Farrar**, 506 U.S. at 114 (internal quotation marks and citation omitted).  As noted *supra*, the Supreme Court has stated that, "[w]here recovery of private damages is the purpose of ... civil rights litigation, a district court, in fixing fees, is obligated to give *primary consideration* to the amount of damages awarded as compared to the amount sought."  **Id**. at 114 (emphasis added).  In this regard, and as the magistrate judge recognized, although Migis testified that a declaration that Pearle violated the law was equally as important to her as damages, that fact, standing alone, would not justify an award of attorney's fees.  *See* **id**.; **Migis**, 944 F. Supp. at 516.

Accordingly, *primary consideration* must be given to a comparison of the damages amounts sought and received.

Although the magistrate judge acknowledged, pursuant to **Farrar**, that the degree of success is the most critical factor in determining the *reasonableness* of the fee award, he reduced it by *only ten percent* (from $89,687.50 to $80,718.75), despite the fact that *Migis recovered only a fraction of the damages sought*. Accordingly, despite stating that a $90,000 fee "would constitute the type of windfall repeatedly condemned by [both] the Supreme Court and" our court, the district court nevertheless concluded, somehow, that a $81,000 fee would not. **Migis**, 944 F. Supp. at 516. And, although the district court complied with **Farrar**'s directive to *consider* Migis' limited success, its opinion does not *explain* why such a minor reduction is sufficient to prevent a windfall. *See* **Louisiana Power & Light Co.**, 50 F.3d at 330. Its opinion reflects, however, that the district court may have been influenced by the settlement amount offered Migis.

The magistrate judge stated that, because Migis received $12,233.32 in damages, and Pearle never offered more than $10,000 to settle, Migis' counsel "should not be unduly penalized because his client pursued a course of action that resulted in a greater recovery." **Migis**, 944 F. Supp. at 516. In that *reason* and *reasonableness* are at stake, I do not understand the district court's rationale. Because I believe that Migis should have recovered only nominal damages for emotional distress, her total damages would be less than the $10,000 offered four months before

trial.  In any event, it is quite debatable, at least to me, that the relatively small amount awarded over the $10,000 is a "greater recovery", especially when one considers the greater price paid in time and money by the parties, counsel, and federal court system in order for Migis to gain that slight increment. Again, *reasonableness* is lost.  As mentioned, the majority does not address the relevance of Migis' refusal to settle.

In *Sheppard v. Riverview Nursing Center, Inc.*, 88 F.3d 1332 (4th Cir.), *cert. denied*, ___ U.S. ___, 117 S. Ct. 483 (1996), the Fourth Circuit stated that a court may consider a plaintiff's rejection of a settlement offer as one of several factors affecting its fee award.  *Id*. at 1337.  *Sheppard* was a mixed-motives case in which the plaintiff proved that pregnancy discrimination played a part in her discharge, but the employer established that, absent discrimination, it would have reached the same decision.

In such cases, Title VII, as amended by the Civil Rights Act of 1991, provides that the court "may" grant attorney's fees.  42 U.S.C. § 2000e-5(g)(2)(B).  Because this is not a mixed-motives case, the fee award is governed by § 2000e-5(k), which, as noted earlier, provides similarly that "the court, in its discretion, may allow the prevailing party ... a *reasonable* attorney's fee ... as part of the costs."  (Emphasis added.)

In that a fee award is discretionary under both provisions, I see no reason why consideration of settlement offers should not be the same under both.  After all, "where a rejected settlement

offer exceeds the ultimate recovery, the plaintiff — although technically the prevailing party — has not received any monetary benefits" from her attorney's *post-offer* services.  *See **Marek v. Chesny***, 473 U.S. 1, 11 (1985).  The same *reasoning* applies where, as here, the award is only slightly greater than the offer. Because I agree with the Fourth Circuit that such consideration will further ***Farrar***'s concerns about the degree of success achieved by the plaintiff, I would hold that a court may consider a plaintiff's rejection of a settlement offer (as well as a plaintiff's settlement demands) as a factor in making the degree of success and other relevant evaluations for its discretionary, *reasonable* fee award.

This action was filed in February 1995; the offer was made approximately a year later; and trial took place about four months after that.  Migis asserts that the settlement offer was *unreasonable* because it was not made until four months before trial and covered not only her claims, but also attorney's fees and costs, and included, as well, non-monetary, prohibitory matters (such as Migis agreeing never to seek employment with either Pearle or any affiliated entities in the future).  At that time, the fees, at the later allowed $250 hourly rate (which seems quite high for this case), would have totaled $30,000, and the costs exceeded $2,000.  Migis concludes, therefore, that the offer was effectively no offer at all, because it "was less than one-fourth of the *monetary* value of the case at the time the offer was made". (Emphasis in original.)  (The offer having been

rejected, the ultimate fee award of $81,000 provided an additional $51,000 to Migis' counsel for effort that gained Migis very little, but gained her counsel a great deal.)

Of course, if the fees of $30,000 are deducted from that calculation, the settlement offer, *at least in monetary terms*, was *more than* Migis' lost pay and benefits.  At oral argument in our court, her counsel persisted in including his fees in calculating the "value" of Migis' case.  Needless to say, counsel errs by calculating the value of a case, for settlement purposes, *from his*, rather than *his client's*, perspective.  Having entered into a contingent-fee agreement, the value of his fees, *for settlement purposes*, is the percentage of his client's recovery that he contracted to accept, not the amount that might be awarded if the case is *not* settled.  And, again needless to say, the settlement decision is the client's.

As discussed, Migis' fee agreement permits counsel to keep a fee award if it *exceeds* 45% of Migis' maximum recovery.  Surely, both when he took the case, and when the settlement offer was made, her counsel had good *reason* to feel that any recovery would be relatively low: first, as shown, liability *vel non* was a close question; second, Migis' maximum back pay was quantified long before she filed this action (began working for another at higher salary approximately two months after last paid by Pearle and four weeks before action filed); and third, recovery of a large amount on Migis' compensatory and punitive damages claims had a

small chance of success.  Accordingly, it is quite arguable that this case was fee, *not client*, driven.

Along this line, one possible scenario would be a hope held by Migis and/or her counsel that the fee award would exceed 45% of her recovery; if so, they would both win — she would keep all of the award and he would have a much larger fee.  Surely, the fee-shifting provision in Title VII was not meant for this.  Where is *reason*?  Where is *reasonableness*?

Obviously, another possible scenario for pressing forward with the case, and running up the *excessive* amount of time and expenses by Migis' counsel, was that Migis, acting on, or against, the advice of counsel, felt that her potential damages far exceeded the $10,000 offered.  This, of course, was Migis' choice, however ill-advised and costly.  She, *not her attorney* (but, I assume, based on his counsel), rolled the dice.  But, when you gamble, you win or you lose.  And when the client loses, a contingent fee counsel must lose as well.  (Or, at least, should lose.  That is not the case here.  *Reason* has taken a back seat.)

This is the underlying purpose of **Farrar**'s focus on the degree of success:  "to prevent a situation in which a client receives a pyrrhic victory and the lawyers take a pot of gold".  **Sheppard**, 88 F.3d at 1339; *see also* **City of Burlington,** 505 U.S. at 563 (federal fee-shifting statutes "were not designed as a form of economic relief to improve the financial lot of lawyers").  Therefore, in order to prevent this windfall to

counsel, I think the court, on remand, should give considerable weight to this rejection-of-settlement-offer factor, and, accordingly, greatly adjust the lodestar downward.

To counter Pearle's windfall-charge, Migis points out that Pearle was billed $206,000 in fees and $14,671 in expenses. She asserts that Pearle's attorneys' expenditure of time (1,000 hours) and their fees and expenses (approximately $220,000) are further evidence that her request and the award were *reasonable*. Pearle moved for a protective order against disclosure of documents and testimony by its counsel regarding such fees, on the ground that Migis' attempt to put those fees at issue was groundless and constituted harassment. Although the record contains no ruling on this motion, it apparently was denied, at least in part, in that, at the hearing on the fee application, Migis' counsel was permitted to question defense counsel extensively about the fees charged Pearle.

The district court's opinion refers also to the fees by Pearle's counsel. 944 F. Supp. at 513-14. Because that reference appears in the section of the opinion rejecting Pearle's contention that the number of hours was *unreasonable* because this case involved no novel or complex issues, it is unclear what, if any, effect it had on the district court's overall *reasonableness* determination. The majority refers to the magistrate judge's notation that Pearle amassed over $200,000 in attorney's fees, but does *not* discuss whether consideration of

those fees is appropriate in determining the *reasonableness* of Migis' fees.

I would hold that Pearle's counsel's fees are *not* relevant in determining whether Migis' counsel's fees are *reasonable* in relation to the degree of success obtained. Twenty years ago, this was explained most adequately by the Seventh Circuit in *Mirabal v. General Motors Acceptance Corp.*, 576 F.2d 729 (7th Cir.), *cert. denied*, 439 U.S. 1039 (1978):

> [A] given case may have greater precedential value for one side than the other. Also, a plaintiff's attorney, by pressing questionable claims and refusing to settle except on outrageous terms, could force a defendant to incur substantial fees which he later uses as a basis for his own fee claim. Moreover, the amount of fees which one side is paid by its client is a matter involving various motivations in an on-going attorney-client relationship and may, therefore, have little relevance to the value which [plaintiff's attorney] has provided to his clients in a given case.

*Id*. at 731. *See also **Samuel v. University of Pittsburgh***, 80 F.R.D. 293, 294 (W.D. Pa. 1978) (emphasis added) ("the number of hours required by opposing counsel to defend a claim has little relevance to the *reasonableness* of the number of hours which plaintiffs' counsel devoted to pursuing a cause of action on behalf of a plaintiff in a given case").

This case certainly appears to be a classic example of "the tail (attorney's fees) wagging the dog (the merits)". Attorneys serve clients to *help* (it is assumed) resolve disputes (the sooner the better); clients and cases don't exist to serve — *much less, to save* — attorneys.

It is fervently hoped that, on remand, the re-evaluation of the *Johnson* degree of success factor will result in restoring the proper reality and proportion — will result in restoring *reason* and *reasonableness* — to this case. It is most regrettable that, first, there will not also be a recalculation of the lodestar.

c.

Migis requests fees of $7,500 for this appeal (30 hours at $250 per hour, excluding her cross-appeal), *an amount that would exceed the total amount Migis would recover, had the compensatory damages been reduced from $5,000 to a nominal amount*. Although her counsel was successful (prevailed) in defending on liability, back pay, compensatory damages, and allowed costs, *he was unsuccessful*, to a large extent, as to the attorney's fee award.

The majority does not address this request. Obviously, an award of $7,500 would be *unreasonable* and constitute an additional windfall to counsel.

2.

Among other allowed costs, Migis was awarded those associated with five depositions taken in connection with her unsuccessful not-offered-another-position claim. *Migis*, 944 F. Supp. at 517. The district court did not allow witness and process fees for two witnesses who did not testify at trial, $170.13 for a copy of Migis' deposition videotape (the subject of her cross-appeal), and expenses related to computerized legal research, courier fees, postage, and photocopying expenses. *Id*. at 517-18. Total awarded costs, other than attorney's fees, were

$4,297.32.  *Id*. at 518.  "We will reverse ... only on a clear showing of abuse of discretion."  See ***Fogleman v. ARAMCO (Arabian American Oil Co.)***, 920 F.2d 278, 285 (5th Cir. 1991).

### a.

Pearle disputes the award of costs for the pursuit of Migis' unsuccessful not-offered-another-position claim.  The majority concludes that, "[e]ven assuming that it is feasible to segregate costs by the two claims Migis prosecuted, Pearle Vision's refusal to rehire her in a new position was arguably of evidentiary value to the claim on which she did prevail -- discrimination in her termination -- even if the refusal to rehire her was not itself found to be a separate Title VII violation."  Maj. Op. at 15.

As stated *supra*, the factual circumstances surrounding Migis' successful position-elimination claim and her unsuccessful not- offered-another-position claim are easily distinguishable from an evidentiary and preparation standpoint.  The decisions were made at different times by different decision-makers, and most of the witnesses who testified regarding the unsuccessful claim offered no testimony that contributed to the success of her position- elimination claim.  Accordingly, for the same reasons that attorney's fees for the unsuccessful claim should not have been awarded, costs associated with pursuing it are *not reasonable* and should have been disallowed.

### b.

I agree that the district court did not abuse its discretion by disallowing Migis' request for $170.13 for her deposition

- 60 -

videotape copy.  Perhaps, as part of trial preparation, counsel wanted the tape to observe Migis' facial expressions, or other body language, or voice level.  But, surely, he was present when she was deposed and could have made those observations then. Perhaps counsel wanted it so that Migis could watch it in order to better prepare to testify.  One can only wonder.

But, more importantly, in the light of the small monetary amount at stake, compared to the cost in judicial resources and to the parties in resolving  this issue, one can also only wonder — indeed, marvel — why this cross-appeal was taken.  At oral argument, Migis' counsel stated it was because of the larger issue — awarding costs for videotapes.  *But, the larger issue was not at hand*.  Obviously, counsel should have saved this question for when it is at issue; at stake was only a copy of Migis' (the plaintiff's) deposition.

Whatever the reason counsel wanted the copy, the copy was not necessary.  And, to say the least, the cross-appeal is most inappropriate.  (An adage comes to mind: "whenever someone says, 'it's not the money, it's the principle' ... it's the money!") Accordingly, I would have required Migis' counsel *to show cause* why sanctions should not be imposed.

### III.

For the foregoing reasons, I concur in affirming liability, back pay, and denial of the videotape copy cost; and in reversing the attorney's fee and remanding for reconsideration.  But, as to that fee, I would offer far more guidance, especially on the

settlement-rejection factor.  And, I respectfully dissent from the affirmance of the compensatory damages, from allowing attorney's fees and associated costs for the pursuit of Migis' unsuccessful not-offered-another-position claim, and from not requiring the lodestar to be otherwise recalculated on remand to include only the hours *reasonably* expended.

We wring our hands and decry the increase in litigation and attendant costs and other excesses, such as frivolous and exorbitant claims, and sky-high, unrealistic, and otherwise *unreasonable* monetary demands and fees.  We bemoan the too often seen lack of civility and professionalism and ethics, as well as the pursuit by some lawyers of, not excellence, but numbing mediocrity, consistent with the heralded "dumbing of America".  Yet, we seem unable or, worse still, unwilling to do anything about it.  Instead, we ask why we have this lack of both *reason* and *reasonableness*.  The answers have been with us from the beginning; two, among many, come quickly to mind: "power fills a vacuum", and "money makes the world go-around".  *Reason* and *reasonableness* can be restored; but, only when we are willing to do so.

I close as I began.  Perhaps this lengthy, back-to-the-basics  analysis will aid in helping spark a new — and much needed — look at Title VII damages and fee awards.  Whatever the case, of this I am certain:  Title VII was not meant to be used as it has been in this case.  It was meant to correct certain discriminatory wrongs and to provide *reasonable* compensation to

those injured and, when deemed appropriate, their counsel.  This case has gone far, far afield.  The result is far from being *reasonable*.  In fact, it is *beyond reason*; hence, beyond the law.