Douglas S. CLEMENTS, Plaintiff,

v.

BARDEN MISSISSIPPI GAMING, L.L.C. d/b/a Fitzgerald's Casino/Hotel Tunica, Defendant.

Civil Action No. 2:02CV302–P–A.

United States District Court, N.D. Mississippi, Delta Division.

May 7, 2004.

Lorrie K. Ridder, Rossie, Luckett, Parker & Ridder, Memphis, TN, for Douglas S. Clements.

Kenneth E. Milam, Watkins & Eager, Jackson, MS, for Barden Mississippi Gaming, LLC, Fitzgerald's Casino/Hotel Tunica.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PEPPER, District Judge.

This cause came to be heard by the court during a three-day bench trial conducted from April 26 to April 28, 2004. Having heard and considered the evidence presented by the parties during the trial of this matter, along with the arguments presented in their pre-trial motions and briefs, the court hereby enters the following findings of facts and conclusions of law.

### FINDINGS OF FACT

1. This case arises from the sale and purchase of Fitzgerald's Casino/Hotel ("Fitzgerald's" or "the seller") located in Tunica, Mississippi. The casino was originally owned by former Co–Defendant Fitzgerald's Mississippi, Inc. which declared bankruptcy in 2000. On or about November 22, 2000, the bankrupt Estate of Fitzgerald's entered into a Purchase and Sale Agreement with Defendant Barden Mississippi Gaming, LLC ("Barden Gaming" or "Purchaser"), a wholly-owned subsidiary of Majestic Gaming, LLC to purchase the assets of Fitzgerald's Casino. The assets to be purchased by the Seller were the three Fitzgerald's Casino's properties lo-cated in Black Hawk, Colorado; Las Vegas, Nevada; and Tunica, Mississippi. The sale was to be fully consummated after midnight of December 6, 2001 and did in fact take place on December 7, 2001.

2. Plaintiff Douglas Clements, a white male, was employed as the Director of Human Resources for Fitzgerald's Casino in May 1999 and remained in that capacity until December 7, 2001 when Barden Gaming came to own the casino. Clements has a degree in Industrial Management and has worked in the Human Resources field since 1987.

3. Pursuant to section 5.04(a) of the Purchase and Sale Agreement between the seller of Fitzgerald's Casino and the purchaser, Barden Gaming, the purchaser agreed to hire the entire workforce of hourly and salaried non-contract employees. Under section 5.04(a), the only employees of the Tunica property that the purchasers, Barden Gaming, had the option of not hiring were those employees that were "leased" employees—*i.e.*, those employees who had employment contracts with the sellers.

4. Section 9.01(a) of the Purchase and Sale Agreement provides in pertinent part that: "Effective as of the Closing, Purchaser [Barden Gaming] shall make bona fide, good faith offers of employment to all of the Employees, other than executive officers of Parent or of any Sellers, probationary Employees or Leased Employees, for employment at the same Business locations where they were employed in the ordinary course prior to the Closing."

5. The parties stipulated in the Pretrial Order that "Under the terms of section 5.04(a) of the Purchase and Sale Agreement, Clements [Plaintiff] did not meet the definition of a Leased Employee at any time after the date of the Purchase and Sale Agreement." PTO, ¶ 9(j).

6. Therefore, the parties stipulated in the Pretrial Order that "Under the terms of section 9.01(a) of the Purchase and Sale Agreement, Clements was an employee to whom a bona fide, good faith offer or employment should have been made." PTO, ¶ 9(I).

7. In plain language, the reason that Barden Gaming should have given the plaintiff a bona fide, good faith offer of employment pursuant to the Purchase and Sale Agreement was because the plaintiff never had an employment contract with the seller, nor with anyone else, and therefore did not meet the Agreement's definition of the type of employee Barden Gaming had the option not to hire. The parties have stipulated these facts clearly in paragraphs 9(I) and 9(j) of the Pretrial Order; therefore, such stipulations supercede any contrary assertions made in previous pleadings. Fed.R.Civ.P. 17(a). No attempt has been made to modify the Pretrial Order.

8. Michael Kelly, a white male, is the Chief Operating Officer of the parent company of Barden Gaming and testified that "the buck stops with me." Don Barden, a black male, is the Chief Executive Officer, President and sole-shareholder of the Majestic parent company that owns Barden Mississippi Gaming, LLC, a wholly-owned subsidiary.

9. In January 2001, Michael Kelly, Chief Operating Officer; David Wolf, Vice President of Finance and Administration; and Jeff Bauer, Corporate Vice President of Marketing, all of whom are white males and are employed by Barden Gaming, went to the Tunica property to "interview" key personnel. On the stand, Kelly stated that in total, they all "interviewed" around twelve directors and or managers in a span of around a day or day and a half. The plaintiff, Douglas Clements, was included as an employee Kelly, Wolff, and Bauer "interviewed." Though Kelly referred to the meeting with Clements as a "formal interview" in his deposition, on the stand Kelly referred to it more as a "meeting" or a "meet and greet." During this meeting with the plaintiff, Kelly avers that he, Wolff and Bauer concluded that Clements was "boring," "bland," and "negative." The court finds that opinions regarding the plaintiff's personality are irrelevant because none of the aforementioned men had the legal option not to hire the plaintiff.

10. Kelly testified that at the time he was "interviewing" or "meeting" the plaintiff in January 2001, Kelly believed that he had the option not to hire Clements because Kelly stated at various times during his deposition and trial that Michael McPherson, a high-ranking executive of the sellers of Fitzgerald's Casino, told Kelly that Clements would be, might be, and had been given an employment contract. During his own deposition, McPherson denied that he ever told Kelly that Clements had a contract or ever would have a contract with the bankrupt sellers of Fitzgerald's over four times. Nevertheless, Kelly testified that he believed he had the right not to hire the plaintiff—even though he now concedes in paragraphs 9(I) and 9(j) of the Pretrial Order that he did not pursuant to the Purchase and Sale Agreement—and therefore decided during that "interview" or "meeting" not to hire Clements. The court disbelieves Kelly's assertions and finds that McPherson did not tell Kelly that the plaintiff had a contract or would be receiving one from the seller of Fitzgerald's Casino.

11. Kelly admitted that during the "interview" or "meeting" there was no discussion of Clements' qualifications. Kelly also agreed that no one ever asked for Clements' resume. Essentially, Kelly asserts that he just did not like Clements and thought he was not positive enough to be his HR director at the Tunica property.

The court finds that it is irrelevant if Kelly did or did not like the plaintiff's personality since pursuant to the Purchase and Sale Agreement, Kelly did not have the right not to hire the plaintiff. As stated above, the court disbelieves Kelly's assertions to the contrary.

12. Kelly avers that he suggested to his Corporate VP of Human Resources, Judith Talbott, that she should "interview" the plaintiff in late August, some seven months later, to "validate" his decision. Judith Talbott testified that she did so and concurred with Mike Kelly's opinions. Talbott also admitted that she never asked the plaintiff about his qualifications nor asked to see his resume.

13. Talbott testified on the stand that she believed that Barden Gaming as the Purchaser had the right not to hire the plaintiff, believing that he had an employment contract with the seller. She also admitted, however, that the plaintiff actually told her that he did not have a contract when she met with him—presumably in late August 2001 when she "interviewed" him. Talbott also stated that she reported to Michael Kelly that the plaintiff told her he did not have a contract and that Kelly advised her that the sellers were "working on a contract" with him and that "this would be taken care of," or words to that effect.

14. Talbott admits she never saw such a contract nor verified its existence.

15. Other than the alleged conversation with McPherson, Kelly never verified the existence of an employment contract between the plaintiff and the seller of the Tunica property.

16. The plaintiff did not learn that he would not be hired by the Purchasers, Barden Gaming, until October 24, 2001 when Kelly instructed the Tunica property's then and current General Manager Dominic Mezzetta to inform the plaintiff he would not be hired. The plaintiff was the only employee of the Tunica property, of over 1000 employees, not to be hired.

17. The plaintiff did not learn exactly when he would be without a job until December 4, 2001—some three days before the sale was consummated.

18. Michael Kelly avers that sometime in September 2001 (which means around eight months after the supposed "interview" or "meeting" with the plaintiff when Kelly states he had decided, yet did not confirm the decision, to not hire the plaintiff) that he asked Tami Tolliver, a black female, if she was interested in becoming the new Human Resources Director at the Tunica property.

19. Kelly also states that he had known Tami Tolliver and her husband Kevin Tolliver for several years prior to 2001. When Kelly allegedly offered Tami Tolliver the HR director position at the Tunica property, she was then working as Casino Service Manager and Assistant Director of Marketing Operations at the Majestic Star Casino in Gary, Indiana—owned by the same parent that owns Barden Mississippi Gaming.

20. Kelly states that he wanted to hire Tami Tolliver for the HR Director position at the Tunica property, replacing Clements, because she had a "bubbly" personality that would be more conducive to improving a perceived morale problem at the Tunica property.

21. Kevin Tolliver, Tami Tolliver's husband, was also hired by the defendant to be the new Slot Director at the Tunica Property—replacing Chip Pfisterer. Mike Kelly promoted Pfisterer to a newly-created position: Vice President of Slots and Operations.

22. Chip Pfisterer, currently on disability because of a brain tumor which appeared to have no bearing on his ability to accurately testify, testified that as the new

VP in charge of slots, he was surprised to learn that Kevin Tolliver was made Slot Director (the position just under Pfisterer's) since Pfisterer was never asked to interview Kevin Tolliver. In fact, Pfisterer testified that he had never met Kevin Tolliver and did not discover that Kevin Tolliver was hired for the Slot Director position until December 7, 2001—the day upon which the sale was consummated. Pfisterer testified that it was odd that Kelly asked for no input from Pfisterer with respect to hiring one of Pfisterer's immediate subordinates. Pfisterer testified that Kevin Tolliver lacked the necessary qualifications to be the Slot Director.

23. Chip Pfisterer states that about a week after the takeover on December 7, 2001, Michael Kelly informed him that the reason he made Kevin Tolliver the new Slot Director was that he was bringing Tami Tolliver in as HR Director to replace Doug Clements and because she was married to Kevin Tolliver, Kelly needed something for Kevin to do. Kelly told Pfisterer during that same meeting something to the effect that if they could purchase the company and put "Mr. Barden's people" in, then "we look good that way." Pfisterer took this to mean that Kelly was hiring Tami and Kevin Tolliver because they were black as was Mr. Barden. Pfisterer also stated that Kelly said that bringing on the Tollivers "fulfilled the wish of Mr. Barden," or something to that effect. In other words, Pfisterer asserts that Kelly communicated to him, directly or indirectly, that the reason the Tollivers were being hired for director positions at the Tunica property was because they were black and that their hiring would "look good" to Mr. Barden, given he was black and owner of the company.

24. Chip Pfisterer no longer works for the defendant, having left in May 2002, and has less reason to not tell the truth than do Michael Kelly, Judith Talbott, and Dominic Mezzetta—all of whom are still employed by the defendant.

25. Chip Pfisterer also testified that within a week after the buyout, Dominic Mezzetta (the General Manager of the Tunica property who was and still is an employee of the defendant) called Pfisterer into his office and was told to sign Kevin Tolliver's acceptance of the Slot Director form. Pfisterer saw that Kevin Tolliver was brought in for a much larger amount of money than that offered to Pfisterer when he had been hired for the same position before. Pfisterer states that Mezzetta was visibly upset during the meeting. Mezzetta told Pfisterer that Tami Tolliver had no experience as a HR Director, that Kevin Tolliver had only been a slot technician and was also not qualified, and that neither he nor Pfisterer had a choice in having to hire the Tollivers.

26. The term "race" was not mentioned by Kelly or Mezzetta to Pfisterer but Pfisterer believes that it was clearly implied.

27. Chip Pfisterer stated that he liked the plaintiff and thought he was not "boring" or "bland."

28. As stipulated by both parties in the Pretrial Order, "Tamara Tolliver, a black female, had no prior Human Resources experience at the time that Barden made her an offer of employment as Human Resources Director of Fitzgerald's Casino Tunica." PTO, ¶ 9(e).

29. In the Pretrial Order, both parties stipulate that "As of 2001, Douglas Clements had more education, experience, and training in the human relations area than Tamara Tolliver." PTO, ¶ 9(g).

30. The parties stipulate that "The Human Resources Director position at Barden's Casino required specialized knowledge in the areas of employee relations, Title VII, FLSA, ERISA, and other federal and state employment laws and regula-

tions, but the director should also possess other skills as well." PTO, ¶ 9(f).

31. Dominic Mezzetta is the current General Manager of Fitzgerald's Casino. He also served in that capacity before and after the takeover. Mezzetta reports to Michael Kelly who reports to Don Barden.

32. Mezzetta stated that as the General Manager of the entire Tunica property, it was usual that he would participate in hiring upper-level employees like managers. He did not do so with the Tollivers. He agreed that the Tolliver's were presented to him as a package-deal, given they were married.

33. Mezzetta stated that if were up to him he never would have "not hired" the plaintiff who was abundantly qualified to be the HR Director and had done a great job in the past. Other than a minor incident regarding a federal subpoena, Mezzetta had no complaints regarding the plaintiff.

34. Mezzetta stated that no one discussed Tami Tolliver's qualifications with him until after she began as the HR Director after December 7, 2001. He did not discover she was not qualified until after she was hired.

35. Mezzetta states that the purpose of the trip Michael Kelly, David Wolff, and Jeff Bauer made to the Tunica property in February 2001, when they met Clements along with around twelve other "key employees," was not to evaluate but rather to "meet and greet."

36. The plaintiff avers that when Mezzetta told him around October 24, 2001 that he would not be hired by the new owners of the Tunica property, the plaintiff was upset and asked him several times why he was not being hired since he had received no notice and had no reason to believe he would not be hired. The plaintiff states that Mezzetta communicated to him, directly or indirectly, that it had noth-ing to do with anything the plaintiff might have done but rather because of Barden Gaming's desire to "diversify" or for "diversity" reasons. During depositions and trial, the defendant made much ado about the plaintiff's inability to recall the exact words that Mezzetta used, but it is sufficiently clear that the plaintiff believes that it was clearly "intimated" or communicated to him by Mezzetta that the reason he was not being hired by Barden Gaming was because of his race. The plaintiff's assertions were credible.

37. Given the aforementioned terms of the Purchase and Sale Agreement between the seller and the purchaser of Fitzgerald's Casino in Tunica, the "not hiring" of the plaintiff by the defendant was a *de facto* termination. Every employee at the Tunica facility was hired by the purchasers on December 7, 2001—except the plaintiff.

38. The plaintiff avers that he continued to interact with Mezzetta on a daily basis during the six weeks between the time Mezzetta told him he would not be rehired by Barden Gaming in October 2001 and the plaintiff's last day at Fitzgerald's on December 4, 2004. During those interactions, the plaintiff states that there were several "conversations" (as opposed to formal meetings) during which Mezzetta directly or indirectly confirmed that the reason the plaintiff was not being rehired by Barden Gaming involved "diversity" or "race." The plaintiff estimated that Mezzetta communicated this to him on approximately eighteen occasions. The plaintiff's assertions were credible.

39. Barden Gaming employs in excess of 500 persons (actually over 1000) and is an employer within the meaning of 42 U.S.C. § 2000e(b). On May 17, 2002, Clements filed his Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC). The filing of the Charge occurred within 180 days of the

commission of the unlawful employment practices alleged therein. Plaintiff received a Notice and Dismissal of Rights on or about September 23, 2002, and filed his Complaint within 90 days of the receipt of the Notice and Dismissal of Rights.

40. It is apparent that the Notice and Dismissal of Rights issued to the Plaintiff was based on inadequate investigation on the part of the EEOC and the reasons therefor were expressed to the Plaintiff in an almost verbatim block quote of the Defendants' response to the Charge. In other words, the EEOC investigator appears to have accepted the Defendant's responses presented to the EEOC by then counsel for Defendant without further investigation.

41. The portions of the response that were copied and incorporated into the EEOC Notice and Dismissal of Rights letter to the plaintiff contained several untruths. For example, the Notice stated that Judith Talbott, Corporate Vice President of Human Resources for the Defendant, made the decision not to hire the plaintiff, when in fact Michael Kelly, the Chief Operating Officer of the Defendant's corporation avers that he made the decision. Nor was there any mention of Kelly in the Defendant's response or the Notice. Stated differently, Talbott testified at trial that Kelly in fact was the prime decision-maker and that she merely "validated" her Chief Operating Officer's decision not to hire the plaintiff. Yet in the response to the plaintiff's Charge (incorporated by the EEOC in its Notice and Dismissal of Rights letter to the plaintiff), Talbott stated that she alone made the decision. This engenders a credibility issue.

42. As stipulated by both parties in the Pretrial Order, Don Barden, President of Barden Mississippi Gaming, LLC, publicly stated that "if you look at our wall of managers here you'll see all white males . . . so we're gonna have more women as managers and more African Americans as managers." PTO, ¶ 9(k). This statement occurred during a Memphis, Tennessee television news interview aired twice on December 10, 2001, three days after Barden Mississippi Gaming, LLC, acquired Fitzgerald's Casino on December 7, 2001. Don Barden made these statements while referring to a wall inside the casino upon which were hanging pictures of managers of the casino. Employees had referred to the wall as the "Great White Wall," given that all of the pictures were of white people. When filmed, there was one blank picture frame on the top row, second from the left, which was supposed to have the plaintiff's picture. It is unclear when exactly Don Barden made this statement (rather than when it was aired) but it had to have been between December 7, 2001 and December 10, 2001. Nevertheless, the statement was made a few days after the plaintiff's last day and a little over a month after the plaintiff learned he would not be hired by Barden Gaming on October 24, 2001.

43. Michael Kelly testified that he made the sole decision not to hire the plaintiff. Kelly alleges that as the Chief Operating Officer, the "buck stops with me." Kelly alleges further that Don Barden, President, CEO, and sole-shareholder of Barden Mississippi Gaming, LLC, had nothing to do with hiring decisions and that Don Barden rarely if ever participated in the day-to-day operations. There is documentary evidence, albeit somewhat paltry, to the contrary. In a letter from Michael Kelly to the seller's of Fitzgerald's Casino regarding the employees that Barden Gaming had the option to not hire, three employees (all of whom were General Managers of the three Fitzgerald's Casino properties, including Dominic Mezzetta) were placed on the list "due to the fact that Mr. Barden was unable to meet with them prior to the due date for this Leased

Employee list." Plaintiff's Exhibit 7. This evidence validates the court's reluctance to accept Kelly's assertion (in addition to the general lack of credibility of Kelly's testimony) that Don Barden had absolutely nothing to do with hiring decisions. It is true that this letter does not necessarily firmly establish in and of itself that Don Barden actually did play a part in the plaintiff not getting hired. However, the letter, combined with the credibility problems and the fact that Don Barden is the President, CEO, and sole-shareholder of the defendant corporation establishes the strong conclusion that Don Barden certainly had the right to hire and fire any employee of his company—including the plaintiff of even Michael Kelly.

44. It has been asserted indirectly by the defendants during pretrial pleadings and trial that because Michael Kelly, Jeff Bauer, David Wolff, Judith Talbott, and Dominic Mezzetta are all white, this fact precludes the possibility that any or all of them could have racially discriminated against the plaintiff because he is also white. This assertion is misguided. A person of a particular race is just as capable of unlawful racial discrimination against a member of his own race as he is of a person of another race. In other words, it is irrelevant what race the decision-makers were in the instant case: if they made an employment decision based on the plaintiff's race, they made an unlawful decision.

45. As to the credibility of all the witnesses observed by the court, the plaintiff and Chip Pfisterer were especially credible in their demeanor, candor, and speed of recollection. The court finds Dominic Mezzetta's testimony credible as a whole, except to the extent he denied ever communicating indirectly or directly to the plaintiff or Chip Pfisterer that the plaintiff was not hired because of his race. Mezzetta is still employed as the General Man-

ager by the defendants. With respect to Mike Kelly and Judith Talbott, the court finds a remarkable absence of credibility. The record is resplendent with examples of impeachment of both, especially with respect to Michael Kelly. Plaintiff's counsel successfully impeached Kelly's testimony on several occasions with inconsistencies and contradictions between his deposition and trial testimony as well as contradictions brought out from trial testimony alone. The court acquired the firm impression that these contradictions were only a small percentage of those that the plaintiff could have demonstrated. The court is of the opinion that Kelly's credibility, or lack thereof, is crucial in the resolution of the instant case.

46. As to damages, the defendants concede that if liability were established (which the defendants deny) the plaintiff would be entitled to $30, 747.00 in backpay as well as to the employer contribution to his 401(K) plan of $1254.00 for only one year since the waiting period to enroll for his new employer was one year.

47. The plaintiff testified that he was informed that he would not be hired by the defendant-purchasers of the casino in which he was the HR Director on October 24, 2001. On December 4, 2001 He discovered that his *de facto* termination would be effective three days later on December 7, 2001. Thus, the plaintiff learned he would no longer have his job as the HR Director between the terrorist bombings of the World Trade Center and the Pentagon on September 11, 2001 and Christmas. Quite naturally, being informed that he would be jobless during this period would engender genuine mental anguish. This anguish most certainly was exacerbated given that the plaintiff made aware he was losing his job because of his race and not because of substandard performance. This would cause outrage and emotional distress to

anyone (which is what Title VII and § 1981 was meant to prevent). The plaintiff testified that during the period between his discharge on December 7, 2001 and April 15, 2002 when he acquired a new job, he experienced withdrawal from his family and friends, depression, and anger. He stated, however, that he did not seek medical attention. He also stated that he felt that his identity had been taken away from him, which is not surprising given that a very important part of most people's identity is his or her job. The plaintiff is entitled to emotional distress damages.

48. The plaintiff's testimony is sufficiently detailed to support an award of $20,000 for emotional distress damages and the same should be given to him.

49. The plaintiff is also entitled to punitive damages in an amount of five times that of his compensatory damages in order to serve as a punishment to the defendant as well as deter future hiring decisions based on race.

50. The plaintiff is also entitled to attorney fees.

### CONCLUSIONS OF LAW

1. This action is brought pursuant to Title VII of the Civil Rights Act of 1965 and 42 U.S.C. § 1981. The Court has jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343.

2. All conditions precedent to the filing of this action under 42 U.S.C. § 2000e, *et seq.* have been fulfilled. 42 U.S.C. § 2000e-5(e).

3. The plaintiff has also set forth a state claim for tortious interference with an employment-at-will contract. This court has jurisdiction over the claim pursuant to 28 U.S.C. § 1367. Such a claim is cognizable in Mississippi. *Levens v. Campbell,* 733 So.2d 753, 760 (Miss.1999). However, this claim cannot lie in the instant case because the defendant never had an employment-at-will contract with the plaintiff. The plaintiff was employed at will by the seller of Fitzgerald's and that employment-at-will contract automatically terminated upon consummation of the sale occurring on December 7, 2001. Even if the defendant had had an employment-at-will contract with the plaintiff, a defendant cannot be liable for interfering with its own contract. The instant plaintiff may have been successful with a third-party beneficiary breach contract claim since the defendant stipulates that pursuant to the Purchase and Sale Agreement *between the defendant and the seller* (not the plaintiff), Barden Gaming should have given the plaintiff a bona fide, good faith offer of employment but did not. However, this was not plead. Given the peculiar posture of all the parties involved in this case, the court concludes that the plaintiff's claim for tortious interference must fail as a matter of law.

4. Tile VII provides in pertinent part that, "[i]t shall be unlawful employment practice for an employer (1) ... to fail or refuse to hire or to discharge any individual ... because of such individual's race." 42 U.S.C. § 2000e-2(a).

5. 42 U.S.C. § 1981 gives equal protection of the laws in making employment contracts. In other words, it is the vehicle through which one sues for wrongful termination based on race. The requirements for establishing wrongful termination under § 1981 are identical to those for racial discrimination under Title VII.

6. By its previous Order of April 1, 2004, the court concluded that the plaintiff established a *prima facie* case of racial discrimination because (1) he is a member of a protected group (a white person); (2) he was qualified for the position held (stipulated in Pretrial Order); (3) he was discharged from the position (the decision by Barden Gaming not to hire the plaintiff was effectively a termination since the

Purchase and Sale Agreement required Barden Gaming to hire the plaintiff); and (4) he was replaced by someone outside the protected group (Tami Tolliver is a black female). *See Byers v. Dallas Morning News, Inc.,* 209 F.3d 419, 426 (5th Cir.2000).

▆▆ 7. Since the plaintiff established a prima facie case of racial discrimination pursuant to Title VII, the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for the adverse employment action. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In its Order of April 1, 2004 in which the court, among other things, denied the defendant's summary judgment, the court concluded that under the summary judgment standards, the defendant had proffered a legitimate, non-discriminatory reason for not hiring the plaintiff— *i.e.,* Michael Kelly did not like the plaintiff's personality, thinking him "boring" and "negative." After the benefit of weighing the credibility of evidence presented at trial and upon further reflection, the court concludes that the reason given by the employer in this case, though non-discriminatory, was not legitimate. The Oxford English Dictionary, the definitive dictionary of the English language, includes the following definition for the word *legitimate:* "Conformable to law or rule; sanctioned or authorized by law or right; lawful; proper." The parties have stipulated in paragraph 9(I) of the Pretrial Order that the defendants should have given the plaintiff a bona fide, good faith offer of employment pursuant to the Purchase and Sale Agreement between the defendant and the sellers of Fitzgerald's Casino. This is based on the stipulation that according to the Agreement, the plaintiff was not a "leased" employee (*i.e.,* one whom the defendant had the option not to hire) because he did not have an employment contract with the sellers. PTO,

¶ 9(j). Thus, any reason given not to hire the plaintiff in this case would not have been legitimate, or not authorized by law or right, given that the defendant was contractually bound to hire the plaintiff.

8. The defendant's position is that Michael Kelly did in fact believe that the plaintiff had a contract with the seller because McPherson told him so (which McPherson denies). Kelly therefore avers that he believed he had the right not to hire the plaintiff. As discussed above, the court does not believe this assertion. However, even if the court did believe Kelly's assertion, the facts that Kelly's belief was mistaken and that the contract legally bound the defendant to give the plaintiff a bona fide, good faith offer of employment make *any* reason given not to hire the plaintiff illegitimate.

▆▆ 9. Even if the reason given by the defendant was to be considered a legitimate, non-discriminatory reason, the court concludes that the plaintiff has met his burden in persuading the finder of fact that the reason given was a pretext for racial discrimination.

▆▆ 10. If the defendant proffers a legitimate, non-discriminatory reason, then the plaintiff must prove by a preponderance of the evidence that the reason was actually a pretext for unlawful discrimination. *E.g., Byers v. Dallas Morning News, Inc.,* 209 F.3d 419 (5th Cir.2000). The plaintiff may prove pretext by demonstrating that a discriminatory motive more than likely motivated his discharge by showing, for example, that the employer's explanation is unworthy of credence. *Wallace v. Methodist Hospital System,* 271 F.3d 212, 220 (5th Cir.2001). As explained above in the findings of fact, the court concludes that the defendant's explanation as to why it did not hire the plaintiff is unworthy of credence. The parties have stipulated that the plaintiff was supposed to have been

given a job. He was not. The defendant through Michael Kelly, the Chief Operating Officer of the defendant corporation, argues that it believed at the time it made the decision that it had the right not to hire the plaintiff. The court disbelieves this assertion.

11. The court concludes that the record and the findings of fact above soundly reflect that the reason given by the defendant for the adverse employment decision was a pretext for racial discrimination. The plaintiff has shown pretext synergistically by persuading the court that: (1) the parties stipulated that the defendant should have given the plaintiff a job; (2) the defendant did not give the plaintiff an offer; (3) the court disbelieves Michael Kelly's assertion that the defendant believed it had the right not to hire the defendant; (4) the parties stipulate that the plaintiff was eminently qualified as a HR Director, having some fourteen years experience; (5) the parties stipulate that his replacement, Tami Tolliver, a black female, had no prior HR experience; (6) Dominic Mezzetta, General Manager of the casino, communicated to the plaintiff directly and indirectly that the reason he was not being hired was because of his race and because the defendant wanted a black person to take the position of HR Director because she was black, not because she was qualified; (7) Michael Kelly informed Chip Pfisterer either directly or indirectly that the reason the defendant was hiring Kevin Tolliver as the Slot Director was directly related to the decision to hire Tami Tolliver, Kevin's wife, as the HR Director; that it would look good to Don Barden to hire "Mr. Barden's people"; and that the reasons for hiring the Tollivers was based upon their race, not their qualifications; (8) Dominic Mezzetta informed Chip Pfisterer that neither Tami Tolliver nor Kevin Tolliver were qualified for their jobs and Mezzetta communicated to Pfisterer directly or indirectly that the reason they were hired was due to their race; (9) Chip Pfisterer's testimony was credible; (10) the plaintiff testified credibly that Dominic Mezzetta communicated to him on approximately eighteen separate occasions either directly or indirectly that the only reason the plaintiff was not being hired was because of his race or "diversity" reasons or to "diversify" and not because of his performance; (11) Mezzetta's denial was not credible, especially given he is still employed by the defendant; (12) Judith Talbott's testimony that the defendant believed it had the right not to hire the plaintiff because he was a "leased" employee was not credible; (13) Don Barden, the President, CEO, and sole-shareholder of Barden Mississippi Gaming, LLC's comment in a television interview aired three days after his company formally acquired Fitzgerald's Casino that "if you look at our wall of managers here you'll see all white males ... so we're gonna have more women as managers and more African Americans as managers." is direct evidence of racial animus; (14) as explained above, the testimony of the defendant's most important representative, Michael Kelly, lacked credibility as evidenced by contradictions and demeanor; and (15) a combination of all these factors, not just any one of them, combine to synergistically prove pretext and that the defendant is liable under Title VII and § 1981 for race discrimination.

■ 12. A "stray remark" can serve as evidence of race discrimination in employment when it is "(1) related to the protected class of persons of which the plaintiff is a member; (2) proximate in time to the adverse employment decision; (3) made by an individual with authority over the employment decision at issue; and (4) related to the employment at issue." *See Patel v. Midland Memorial Hospital and Medical Ctr.*, 298 F.3d 333, 343 (5th Cir.2002). Don

Barden's statement in a television interview that was made sometime between December 7 and December 10, 2001 and aired twice on December 10, "if you look at our wall of managers here you'll see all white males ... so we're gonna have more women as managers and more African Americans as managers" is related to the protected class of persons of which Douglas Clements is a member-*i.e.*, the plaintiff is not a woman nor is he black. The court believes that the statement in December is sufficiently proximate in time to the date upon which the plaintiff was not hired by the defendant. The plaintiff found out on October 24, 2001 from his general manager that he was not to be hired. Michael Kelly said he made the decision not to hire the plaintiff in January 2001 but did not fully confirm that decision until sometime in August 2001. Kelly alleges he offered Tami Tolliver the plaintiff's job sometime in September 2001. The plaintiff was told on December 4 that the sale would go through on December 7 and that December 4 would be his last day. Don Barden's statement was aired on December 10. The third element requires the "stray remark" to have been made by an individual *with authority* over the employment decision at issue. As discussed above, Don Barden is the President, CEO, and sole-shareholder of Barden Mississippi Gaming, LLC. In his capacity as such, he has the authority to hire or fire anyone in the company he chooses, including Michael Kelly, the Chief Operating Officer. Therefore, it is untenable to say that Don Barden did not have authority to decide if the plaintiff should be hired as the HR Director. The final element requires that the "stray remark" be related to the employment at issue. The employment at issue is the plaintiff continuing as the HR Director of Fitzgerald's Casino. Don Barden was referring to the wall upon which were hanging the pictures of all the management of the casino. Though the plaintiff's picture was not on the wall, there was a blank frame on the top row, second from the left in which the plaintiff's picture was supposed to be. During the trial, the plaintiff established through a last-minute witness that she had taken the plaintiff's picture for that purpose. Nevertheless, the wall contained pictures of all the directors. The plaintiff had been a director; thus the "stray remark" was related to the employment at issue.

13. The court concludes that Don Barden's "stray remark" can serve as evidence of racial discrimination in violation of Title VII. The plaintiff has met his burden even without this evidence, but with it, his case is certainly strengthened.

14. Title VII provides in pertinent part that, "[i]t shall be unlawful employment practice for an employer (1) ... to fail or refuse to hire or to discharge any individual ... because of such individual's race." 42 U.S.C. § 2000e–2(a). The findings of fact and conclusions of law set forth above lead the court to conclude that it is more likely than not that the plaintiff was not hired (or effectively discharged) because of his race. The defendant propounds two arguments meant to vitiate the plaintiff's case. The first is the fact that, with the exception of the Don Barden who is President, CEO, and sole-shareholder of the defendant corporation, all of the players in this case are white (*e.g.*, Michael Kelly, Judith Talbott, etc.) as is the plaintiff. Second, the defendant has cited *Livingston v. Roadway Express, Inc.* 802 F.2d 1250, 1253 (10th Cir.1986) for the proposition that because the plaintiff is white (*i.e.*, because this is a "reverse discrimination" case), the plaintiff must present evidence to sustain a reasonable probability that the plaintiff's race motivated his discharge, because there is no reason to presume racial discrimination against historically favored groups. Both arguments are illogical and

even dangerous, given the clear meaning of 42 U.S.C. § 2000e–2(a): one must not use race as a motivating factor in hiring or firing an individual. The statute does not say nor should it be interpreted to apply to some races and not to others, or to apply only when certain races racially discriminate against other races but not others. Such interpretation would be racial discrimination in and of itself. Title VII calls for *no* race discrimination and to apply different standards when white people are involved is a clear perversion of a noble and crucial goal: to erase racism in *all* its forms.

■ 15. 42 U.S.C. § 1981 gives equal protection of the laws in making employment contracts. In other words, it is the vehicle through which one sues for wrongful termination based on race.

■ 16. The plaintiff, as a white person, can sue under 42 U.S.C. § 1981 for discrimination against him in favor of a black person. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 287, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). Furthermore, a white person can also sue under § 1981 for discrimination against him by another white person. *Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 107 S.Ct. 2022, 2026, 95 L.Ed.2d 582 (1987). At-will employment relations are contractual and thus are covered by § 1981. *Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc.*, 160 F.3d 1048 (5th Cir.1998). The requirements for establishing wrongful termination under § 1981 are identical to those for racial discrimination under Title VII. *See e.g., Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124 (4th Cir.2002). In his § 1981 claim, the plaintiff must prove discriminatory intent. *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 583 n. 16, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984). Discriminatory intent may be demonstrated by the *McDonnell Douglas* approach used in Title

VII cases. *See Singh v. Shoney's Inc.*, 64 F.3d 217, 219 (5th Cir.1995).

■ 17. The question remains as to whether the plaintiff has likewise proven his race discrimination claim pursuant to § 1981. The plaintiff has proven his Title VII claim. As demonstrated above, the tests for both claims are identical—*i.e.,* the plaintiff must show a *prima facie* case of race discrimination; if he does, the defendant must proffer a legitimate, nondiscriminatory reason for the adverse action; then, if the defendant does so, the plaintiff must prove the reason given was a pretext for race discrimination. To prove his § 1981 claim, the plaintiff must demonstrate that race discrimination interfered with his employment-at-will such that he was wrongfully terminated. Because the plaintiff has proven his Title VII claim as outlined above, the plaintiff need only prove one more element to establish his § 1981 claim: that the defendant wrongfully terminated him based racial discrimination. The defendant argues that Barden Mississippi Gaming, LLC never actually hired the plaintiff and thus could not be liable for wrongfully terminating him. This is true, hyper-technically. However, given that the Purchase and Sale Agreement between the seller and the defendant-purchaser of Fitzgerald's Casino fully intended that the seller would terminate everyone's employment at midnight on December 6, 2001 and that the defendant would hire everyone (with the exception of the "leased employees" which the defendants have conceded the plaintiff was not) one second later on December 7, 2001, the court concludes that the "not-hiring" of the plaintiff serves as an effective or *de facto* termination for § 1981 purposes. Given the plaintiff has met his burden in proving race discrimination, the court concludes further that the plaintiff was effectively

wrongfully terminated based on his race by the defendant in violation of § 1981.

18. Because the court concludes that the defendant is liable under Title VII and § 1981 for race discrimination and is not liable under Mississippi law for tortious interference with an employment-at-will contract, the plaintiff is entitled to damages.

■ 19. As explained in more detail in the findings of fact, the plaintiff is entitled to $20,000 for emotional damages. This is true even though he did not seek medical attention for his damages. Anyone who learns that he or she has been rendered jobless because of his or her race has the right to feel outraged—Title VII and § 1981 were designed in large part to prevent this kind of outrage. The Fifth Circuit Court of Appeals has "not required corroborating testimony and medical evidence in every case involving nonpecuniary compensatory damages." *Oden v. Oktibbeha County, Mississippi*, 246 F.3d 458, 470 (5th Cir.2001) (citing *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1046 (1998)). "In *Migis*, the district court relied solely on the plaintiff's testimony .... [the Fifth Circuit Court of Appeals] concluded that the district court did not abuse its discretion by awarding compensatory damages because Migis' testimony was sufficiently detailed to support the award." *Id.* This court concludes that given the circumstances and the plaintiff's testimony, the court concludes that the plaintiff is entitled to emotional damages in the amount of $20,000.

■ 20. The court concludes that the plaintiff is also entitled to punitive damages pursuant to 42 U.S.C. § 1981a(b)(1). The defendant, by not hiring the plaintiff because of his race when it more likely than not knew it was contractually bound to do so, acted with at least reckless indifference to the federal protected rights of the plaintiff, if not with malice. Contrary to the plaintiffs assertions, however, the compensatory damage amount (including punitive damages and emotional damages but not including backpay) is limited to $300,000 pursuant to § 1981a(b)(3)(D). The U.S. Supreme Court has recently instructed that with respect to punitive damage awards, "[s]ingle-digit multipliers are more likely to comport with due process." *State Farm Mutual Automobile Insurance Company v. Campbell*, 538 U.S. 408, 425, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). The total amount of non-punitive damages in this case equals $30747.66 in backpay plus $1254 for the plaintiff's 401(K) plus $20,000 in emotional damages, for a total of $52,001. Section 1981a(b)(2) excludes backpay from "compensatory damages." The $1254 for the 401(K) should be included as backpay, thus bringing the total of backpay to $32, 001. Thus, the statutory limit of $300,000 for compensatory damages (excluding backpay and including emotional damages) minus $20,000 emotional damages equals $280,000. As stated above, the court finds that a single-digit multiplier of 5 should be put to the total amount of non-punitive damages or $52,001 to reach a total of $260,005 for punitive damages. Adding the $20,000 of emotional damages to this amount and excluding backpay would bring the plaintiff's damages well within the statutory limits.

21. The punitive damages are based solely the defendant's violation of Title VII. The court declines to award punitive damages based upon the defendant's violation of 42 U.S.C. § 1981.

22. Therefore, the defendant is liable to the plaintiff for $30,747.00 plus $1254.00 for backpay; plus $20,000.00 in emotional damages; plus $260,005.00 for punitive damages.

■ 23. The plaintiff is not entitled to front pay in addition to the punitive damages. The Fifth Circuit Court of Appeals

cautioned against awarding both in *Shattuck v. Kinetic Concepts, Inc.*, 49 F.3d 1106, 1110 (5th Cir.1995).

24. The plaintiff is the prevailing party for the purposes of an award of attorneys' fees under 42 U.S.C. § 2000e–5(k). Therefore, the plaintiff's attorneys are entitled to recover fees in an amount to be established by submission of proof evincing these attorneys' fees and costs.

Judgment of the court will be issued forthwith.

**THIS DAY** of May 7, A.D., 2004.